**BLANK ROME LLP**
Dennis Ehling (SBN 168892)
Dennis.Ehling@BlankRome.com
Benjamin M. Wigley (SBN 329736)
Benjamin.Wigley@BlankRome.com
2029 Century Park East, 6th Floor
Los Angeles, CA  90067
Telephone: 424.239.3400
Facsimile:  424.239.3434

Michael A. Iannucci (*Pro Hac Vice*)
Michael.Iannucci@BlankRome.com
Bridget Briggs (*Pro Hac Vice*)
Bridget.Briggs@BlankRome.com
One Logan Square
Philadelphia, PA 19103
Telephone: 215.569.5500
Facsimile:  215.569.5555


Attorneys for Plaintiff, Xsolla (USA), Inc.,
a California Corporation

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| XSOLLA (USA), INC., a California Corporation,<br><br>             Plaintiff,<br><br>       v.<br><br>AGHANIM INC., a Delaware Corporation; Albert Tagirovich Tugushev; and DOES 1 through 50,<br><br>             Defendants. | Case No. 2:24-cv-02116-ODW-AGR<br><br>**SECOND AMENDED COMPLAINT** |

Plaintiff Xsolla (USA), Inc. brings this action against Defendants Aghanim Inc., Albert Tagirovich Tugushev, and Does 1-50 and alleges the following:

## INTRODUCTION

1.     This case arises from former executives raiding Xsolla (USA), Inc.'s ("Xsolla" or "Plaintiff") confidential, proprietary and trade secret information related to the technology and development of unique and customizable payment processing support and monetization systems in the hyper competitive online gaming developer and producer industry. Using Xsolla's information as the foundation for their new company, the former employees started Aghanim Inc. ("Aghanim"), a company that purports to offer the *same* services to the *same* customers in the *same* industry as Xsolla.

2.     Aghanim's founders—all former Xsolla executives—left Xsolla in or around May and June 2023. Prior to launching Aghanim, the founders accumulated confidential and trade secret Xsolla information. Effectively, they gave themselves a free start-up guide for creating a directly competitive business.

3.     By August 2023, only two months after all the Aghanim's founders left Xsolla, they were already soliciting investors and heavily pitching themselves as the "new Xsolla" to anyone and everyone that would listen, including known clients of Xsolla.

4.     Aghanim advertised itself as the "new Xsolla", a payment and support platform for independent video game developers and producers—the same industry in which Xsolla is the market leader. Aghanim claimed to be able to provide substantially identical features and offerings, advertising the same functionalities as Xsolla's platform. Even worse, some of the features published by Aghanim on its website mirrored unpublished offerings in development at Xsolla. These unpublished offerings involved trade secrets that took vast amounts of manpower and investment to develop. Aghanim also capitalized on Xsolla's existing research and development into browser-to-app payment platforms.

**SECOND AMENDED COMPLAINT**

5.    Armed with Xsolla's confidential, proprietary and trade secret information, Aghanim unveiled its new platform to the market on February 14, 2024—a mere eight (8) months after Aghanim's founders exited Xsolla—an impossible timeline for the independent development of such a complex and technical platform.

6.    Indeed, Aghanim's speed to market is an unheard-of and unrealistic speed to market for the industry that was only possible by the improper leveraging of Xsolla's confidential, proprietary and trade secret information. As detailed below, Xsolla's investigation thus far has uncovered intentional and unlawful access by Aghanim and its founders of confidential and proprietary systems of Xsolla – well after they all exited Xsolla and launched Aghanim. They used dummy accounts to access critical and trade secret information and forwarded proprietary documents to personal emails, in a futile attempt to do harm undetected.

7.    In addition, based on Xsolla's nearly 20 years of experience in the video game support and payment platform industry, Aghanim could not possibly have independently developed, beta tested, and soft launched a payment support and monetization platform in a mere eight (8) months. Nor could Aghanim independently research and develop the whole host of related services and products being offered therewith—many of which are virtually identical to Xsolla's, and some of which are based on proprietary Xsolla offerings that have not yet been made public. But for Aghanim's use of stolen Xsolla trade secrets, Aghanim would not be able to offer a directly competing video game support, payment and monetization platform within a few short months of its founding.

8.    On top of using Xsolla's technical information, Aghanim also continues to use Xsolla confidential and trade secret information to improperly solicit Xsolla customers to use their "new Xsolla" support and payment platform. Aghanim has leveraged Xsolla trade secrets by reaching out to deeply embedded Xsolla customer contacts. None of these embedded customer contacts were personally known to the

2

Aghanim founders. Rather, this information was obtained from Xsolla's marketing database, Sales Force.

9.    Aghanim's conduct has forced Xsolla to reconsider its long-term strategy, spend countless hours assuring customers of Xsolla's ongoing viability, spend resources to implement additional security measures, and adjust its pricing to counteract Aghanim's attempts to undercut Xsolla in the market. Xsolla has also lost valuable business relationships opportunities. Aghanim's wrongdoing is ongoing and has cost Xsolla millions.

## THE PARTIES

10.    Xsolla is a corporation organized under the laws of the State of California. Its principal place of business is Sherman Oaks, California.

11.    Aghanim is a corporation organized under the laws of the State of Delaware. On information and belief, its principal place of business is in Los Angeles County, California.

12.    Albert Tagirovich Tugushev ("Tugushev") is an adult individual residing in Tivat, Montenegro. He is a co-founder of Aghanim and formerly worked for Xsolla.[1]

13.    The true names and capacities of the Defendants sued herein as DOES 1 through 50, inclusive, are currently unknown to Xsolla, which therefore sues such Defendants by fictitious names. Each of the Defendants designated herein as a DOE is legally responsible for the unlawful acts alleged herein. Xsolla will seek leave of Court to amend the Complaint to reflect the true names and capacities of the DOE Defendants when such identities become known.

14.    Xsolla is informed and believes and thereon alleges that at all relevant times, each and every Defendant was acting as an agent and/or employee of each of

---

[1] The other co-founders of Aghanim are Konstantin Golubitsky ("Golubitsky") and Constantin Andry ("Andry") the former CEO of Xsolla and CEO of Xsolla Labs-an Xsolla subsidiary, respectively. They are not parties to this lawsuit, as Xsolla has valid arbitration agreements with Golubitsky and Andry. Xsolla has commenced AAA arbitration against Golubitsky and Andry accordingly.

**SECOND AMENDED COMPLAINT**

the other Defendants and was acting within the course and scope of said agency and/or employment with the full knowledge and consent of each of the other Defendants. Xsolla is informed and believes and thereon alleges that each of the acts and/or omissions complained of herein was made known to, and ratified by, each of the other Defendants.

## JURISDICTION AND VENUE

15.    This Court has subject matter jurisdiction under 18 U.S.C. § 1836(c), 15 U.S.C. §§ 1114, 1116, 1117 and 28 U.S.C. §§ 1331 and 1367.

16.    This Court has personal jurisdiction over Aghanim because its principal place of business is located in the State of California, and Xsolla's claims arise out of or relate to Aghanim's contact with California.

17.    The Court has personal jurisdiction over Tugushev because he is a co-founder and principal of Aghanim, which has a principal place of business in the State of California, and he formerly worked for Xsolla, which operates in California. Further, Xsolla's claims arise out of or relate to Tugushev's contacts within California.

18.    Venue is properly laid in this Court pursuant to 28 U.S.C. § 1391.

## FACTUAL ALLEGATIONS

### Xsolla

19.    Xsolla is the leading global video game monetization solution. It provides video game developers and publishers with payment, billing, distribution, support, and marketing technology for cross-platform video game businesses on a global scale.

20.    The market for monetization technology advertised to independent video game developers and publishers is highly competitive. All companies in this industry fiercely protect their intellectual property and customer information. Companies in this sector perform market research on potential customers, their needs, and how to

competitively price the market. Each company's market research and strategies differ based on their intended clientele and experience in the industry.

21. Xsolla is unique for, among other technologies, its development of a confidential and proprietary algorithm pertaining to global tax compliance and Value Added Tax ("VAT") registration as merchant of record. This algorithm and service allows for independent video game developers and publishers throughout the world to charge and collect the correct taxes from their players through use of Xsolla's software and then pay those taxes to the various VAT governmental entities, with Xsolla acting as the merchant of record. Xsolla's innovative algorithm and merchant of record services are unique in the industry and thousands of man hours and significant financial investments have been expended over the course of many years to develop these services. No other competitor on the market can calculate taxes as well as Xsolla's algorithm and also pay VAT taxes through its merchant of record services.

22. Xsolla's other unique technologies include:

a. **Pay Station** (its checkout tool)—this unique tool allows videogame developers and producers to plug Xsolla's checkout tool into their games for fast and efficient transactions;

b. **Fraud protection and monitoring algorithm**—this algorithm uses proprietary and trade secret information to pinpoint signs of fraud. It is unique to Xsolla and allows Xsolla to quickly identify fraud;

c. **Site Builder**—this unique tool allows developers to create a website that incorporates access through the web for in-game purchases;

d. **Web Shop**—through the use of Xsolla's proprietary and trade secret information, its Web Shop and related tools allow for browser-to-app purchases, so purchases can be made outside the Apple App Store or Google Play Store's restricted environment in compliance with the law. This is innovative and unique to Xsolla;

5

e.    **In-Game Services**—Xsolla uses a series of algorithms to allow video game developers and producers to set-up purchase options for various items inside a game. These In-Game Services use data Xsolla has collected over years of experience, experimentation and investment to pinpoint the best options for its customers and manage the back-end for players' in-app purchases;

f.    **Personalization Tools**—a series of proprietary tools that allow Xsolla's customers to receive player data and feedback and organize it in a manner Xsolla's customers can readily access, analyze, and utilize in future developments, and enable customers to quickly adapt their businesses to optimize monetization by customizing player experiences. Xsolla spent years crafting these proprietary tools; and

g.    **Related Marketing Solutions, Game Launcher App and Xsolla Mall**—all proprietary tools that enable customers to better monetize offerings through a variety of offerings.

23.    The video game industry has three primary forms of monetization: (i) subscription-based opportunities; (ii) in-app or web-based purchases; or (iii) some combination of both. A subscription-based monetization model relies on monthly or yearly payments so players can access certain upgrades or features of the video game. An in-app or web-based purchase monetization model relies upon player purchases of individual items, upgrades, or features to drive revenue.

24.    Aleksandr Agapitov founded Xsolla in 2005. Over its nearly two decades in business, Xsolla has been at the forefront of in-game payment solutions for independent video game developers and publishers across the globe. Xsolla provides customizable solutions for both the subscription-based and purchase monetization models for video games. This enables the developers and publishers to pick and customize their preferred monetization model. Xsolla in turn provides a safe and secure platform for developers and publishers to receive payment for their games.

**SECOND AMENDED COMPLAINT**

25.    In the past 20 years, Xsolla has, through years of market research, investment, and time, cultivated relationships with many of the top independent video game developers and publishers. It has spent countless hours developing confidential and proprietary pricing schemes tailored to the needs of the individual video game developers and publishers. Through feedback on features and costs, Xsolla knows how to price and customize its offerings to any video game developer and publisher, regardless of size. In addition to a confidential and proprietary service pricing formula, which took many years and significant effort and testing to develop, Xsolla also has negotiated special preferred pricing with certain long-term customers. These special negotiated rates as well as Xsolla's customer lists and related customer information, such as customized solutions for individual customer problems, are proprietary, kept in confidence, and represent trade secret information.

26.    Xsolla uses Sales Force to store this information, including:

a.    Fiscal/revenue expectations for each partner or prospect;

b.    Xsolla's specific non-public contact information for each partner or prospect;

c.    Identities of partner decisionmakers, including the identities of decisionmakers that would not be apparent by their title;

d.    Open opportunities and projects with each partner or prospective customer;

e.    Opportunities and projects Xsolla is currently working on for each partner customer;

f.    Detailed narratives of all conversations with partners and prospects to document the status of the relationship, including any customer issues, complaints, the status of negotiations with prospective customers, partner requests for future projects and potential upcoming opportunities for each partner or prospective customer; and

**SECOND AMENDED COMPLAINT**

g.    The scope of work being performed for many partners and "blueprints" of the offerings and pricing for large partners.

27.    As the video game industry exploded over the past 20 years, Xsolla has expanded its operations exponentially. Currently, Xsolla has nearly 1,000 employees worldwide. It has invested substantial resources in hiring the cream of the crop. It has carefully cultivated a homegrown pool of talented, educated, and highly specialized professionals, including computer engineers, software engineers, video game industry salespeople, and other technical specialists. In many cases, Xsolla must invest heavily in the training of its technical specialists before they can support Xsolla's product development or begin marketing Xsolla's services globally. Xsolla pays competitive salaries, and information regarding the training and salaries of Xsolla's employees is confidential.

28.    Most Xsolla employees sign confidentiality agreements providing that they will not disclose or remove Xsolla's confidential, proprietary, and trade secret information. All employees also sign the Xsolla Employee Handbook which includes language detailing the importance of confidentiality to Xsolla.

29.    Up until recently, all purchases for mobile video game apps had to occur through the Apple App Store or the Google Play Store. These stores usually charge around a 30% fee on all transactions. In late 2021, it became possible to make mobile video game purchases outside of the Apple App Store and the Google Play Store. This presented an opportunity for Xsolla to market its services to a larger community. It also allowed for greater innovation in the video game monetization solution industry. For example, in 2022, Xsolla began researching and developing a browser-to-app monetization platform. This innovative platform would allow users to make a subscription or in-app purchase on a PC video game and then, subsequently, use that subscription or in-app purchase in their mobile video game experience and vice versa. This solution, if implemented, would allow independent video game developers and

**SECOND AMENDED COMPLAINT**

producers to market their games to a greater number of users in a greater number of applications.

## Andry, Golubitsky and Tugushev

30.    Over a decade ago, Golubitsky began working for Xsolla as a Team Lead. He later served as Xsolla's Chief Technology Officer. Subsequently, he was elevated to be Xsolla's Chief Executive Officer. Over the course of the years, he had access to all of Xsolla's crown jewels. He had access to and knowledge of Xsolla's most sensitive algorithms and he, along with other Xsolla team members, helped design many features that make Xsolla the most successful company in the independent video game developer, producer payment and service platform industry. Golubitsky was integral in devising Xsolla's business strategy. He knew Xsolla's market and the individual companies that Xsolla targeted with its products and services, and had full access to Xsolla's Sales Force database. He also knew Xsolla's pricing model and the special (and non-public) pricing Xsolla provides to certain customers. Golubitsky was also intimately familiar with Xsolla's highly confidential business and internal growth plans.

31.    On February 1, 2020, upon Golubitsky's promotion to Chief Technology Officer, he signed an Employment Agreement that includes a Confidentiality clause, which states:

> Employee agrees to execute and abide by any and all lawful policies enacted by the Company with respect to confidentiality, proprietary information, and invention assignment. Employee acknowledges that any breach or threatened breach by him of such provisions may cause irreparable injury to the Company. Employee therefore agrees that, in addition to any other right or remedy Company may have, Company shall be entitled to seek specific performance and/or seek temporary, preliminary or permanent injunctive relief enjoining or restraining any breach or threatened breach, without the necessity of proving the inadequacy of monetary damages or the posting of any bond or security. The availability of specific performance or injunctive relief for the breach or threatened breach by Employee of this Agreement shall in no

9

way limit or otherwise affect the availability of other remedies to Company, including monetary damages, for injuries sustained that specific performance or an injunction will not remedy.

32.    Golubitsky's Employment Agreement further contains provisions protecting work product created by employees of Xsolla:

4.2. Ownership of Work Product. The Company shall own all Work Product arising during the course of the Employee's employment (prior, present, or future). For purposes hereof, "Work Product" shall mean all intellectual property rights, including all Trade Secrets, U.S. and international copyrights, patentable inventions, and other intellectual property rights in any programming, documentation, technology or other work product that relates to the Company, its business or its customers and that Employee conceives, develops, or delivers to the Company at any time during his employment, during or outside normal working hours, in or away from the facilities of the Company, and whether or not requested by the Company. If the Work Product contains any materials, programming or intellectual property rights that Employee conceived or developed prior to, and independent of, the Employee's work for the Company, Employee agrees to point out the pre-existing items to the Company and Employee grants the Company a worldwide, unrestricted, royalty-free right, including the right to sublicense such items. Employee agrees to take such actions and execute such further acknowledgments and assignments as the Company may reasonably request to give effect to this provision.

4.3. Property of the Company. All records and files involved in Company's operations are the property of the Company and shall remain so upon termination of Employee's employment. Employee agrees to deliver to the Company all property or documents of Employer, including without limitation all computer records and files immediately upon termination of Employee's employment or upon Company's request.

33.    Golubitsky also signed Xsolla's 2022 Employee Handbook on April 20, 2022, which contains a confidentiality provision at section 5-11, stating, in part:

During the course of your employment, you may become aware of confidential information about Xsolla (USA), Inc.'s business, including but not limited to information regarding the Company's finances,

10

**SECOND AMENDED COMPLAINT**

pricing, products and new product development, software and computer programs, marketing strategies, suppliers, customers and potential customers. You may also become aware of similar confidential information belonging to the Company's clients. It is extremely important that all such information remain confidential and, in particular, not be disclosed to our competitors. Any employee who improperly copies, removes (whether physically or electronically), uses or discloses confidential information to anyone outside of the Company may be subject to disciplinary action, up to and including termination of employment. Employees will be required to sign a confidentiality agreement reiterating these obligations.

34.    The Employee Handbook provides other protections of Xsolla's confidential information as well. Section 5-13 provides: "Employees also are prohibited from any unauthorized use of the Company's intellectual property, such as audio and video recordings, print materials and software." Further, Section 5-21 provides: "Employees also must return all of the Company's confidential information upon separation."

35.    Several years after Golubitsky joined Xsolla, Andry commenced employment with Xsolla in 2016 as a Product Portfolio Ninja. He worked his way up the company and eventually became the CEO of Xsolla's subsidiary, Xsolla Labs, in 2021. Xsolla Labs was the new products/innovation arm for Xsolla. It invested in developers and worked to create new Xsolla products and services. Xsolla Labs focused on mobile gaming and Xsolla's browser-to-app payment platform. At Xsolla Labs, Andry helped develop Xsolla's cutting-edge technology and developed long-term growth plans for Xsolla. He had access to and knowledge of the most sensitive of Xsolla's information, including its research and development into the next generation of monetization services and platforms, not all of which have yet been introduced to market, and which are highly proprietary.

36.    On April 19, 2022, Andry signed the 2022 Xsolla Employee Handbook, containing the same confidentiality provisions as that signed by Golubitsky.

**SECOND AMENDED COMPLAINT**

37.    Tugushev commenced employment with Xsolla in 2023 as the CTO of Xsolla Labs (an Xsolla subsidiary).

38.    At Xsolla Labs, Tugushev worked with Andry to develop Xsolla's state-of-the-art technology. He had access to and knowledge of the most sensitive of Xsolla's new product development information, including its research and development into the next generation of monetization services and platforms, not all of which have yet been introduced to market, and which are highly proprietary and confidential.

39.    On March 1, 2023, Tugushev signed an Independent Contractor Agreement with Xsolla, which further protects Xsolla's confidential, proprietary and trade secret information:

> 9.1 Neither Party shall disclose any confidential information of the other Party (including, without limitation, trade secrets). Either Party receiving confidential data shall treat it with diligence and in accordance with the Agreement in order to avoid disclosure of the disclosing Party's data.

> 9.2 For the purposes specified above, the Parties acknowledge entering into a separate nondisclosure agreement relating to the confidential information ("MUTUAL CONFIDENTIALITY AGREEMENT").

> 9.3 Within the scope of the Agreement, the Independent Contractor will have access to the internal documentation and internal accounting systems for the development and design of product solutions and the infrastructure of internal services, which are a commercial secret of the Company.

40.    The Independent Contractor Agreement further contains provisions protecting Xsolla's rights in work product created while Tugushev worked for Xsolla:

> 12.1 The Independent Contractor hereby assigns to the Company all rights, including, without limitation, copyrights, patents, trade secret rights and other intellectual property rights (a) developed or created by the Independent Contractor, solely, or jointly with others, during the course of providing Services for and on behalf of the Company or any affiliate of the Company, or the predecessors of any such entities,

12

**SECOND AMENDED COMPLAINT**

whether as an employee or independent contractor, (b) that the Independent Contractor conceives, develops, discovers, or makes in whole or in part during the Term of this Agreement that are made through the use of any of the equipment, facilities, supplies, trade secrets of the Company or any affiliate of the Company, that result from any service the Independent Contractor performs for the Company or any affiliate of the Company or (c) developed or created by the Independent Contractor, solely or jointly with others, at any time before the Term of this Agreement, that relate to or involve the Company's businesses (including, but not limited to, the business of the Company and its affiliates) (collectively, the "Service Product"). If, notwithstanding the foregoing, the Independent Contractor, for any reason retains any right, title, or interest in or relating to any Service Product, the Independent Contractor agrees promptly to assign, in writing and without any requirement of further consideration, all such right, title and interest to the Company. Upon request of the Company at any time during or after the Term, the Independent Contractor will take such further actions, including execution and delivery of instruments of conveyance, as may be appropriate to evidence, perfect, record or otherwise give full and proper effect to any assignments of rights under or pursuant to this Agreement. The Independent Contractor will promptly disclose to the Company any such Service Product in writing.

12.2 Intellectual Property developed, acquired, or otherwise obtained by the Independent Contractor prior to this Agreement or licensed or obtained by the Independent Contractor from third parties may not be used by the Independent Contractor in the performance of Services unless such Intellectual Property and any applicable third-party license terms, therefore, have been specifically identified and described in the Scope of Services. The Independent Contractor represents and warrants that the Independent Contractor has an unqualified right to license and/or assign to the Company all third-party Intellectual Property.

41.    Tugushev signed a second Independent Contractor Agreement with the same provisions, extending his engagement with Xsolla until June 30, 2023.

42.    Throughout their time with Xsolla, Golubitsky, Andry and Tugushev had access to the most sensitive and mission-critical Xsolla information, including its customer information, marketing information, confidential and in-development product and service offerings, technical information, research and development, and

13

long-term business plans and goals. Xsolla trusted each to guide the company and plan for its future. The Aghanim founders also played a pivotal role in Xsolla's development of pricing structures, product innovation and marketing strategies. Golubitsky, Andry and Tugushev each explicitly acknowledged that all of this information is confidential and constitutes trade secrets and knew that it was not to be taken or misappropriated for personal or competitive use. They knew that taking the information and using it for non-company purposes was improper and could lead to termination, among other things.

43.    In May 2023, Golubitsky's employment with Xsolla ceased. After that time, he was no longer permitted access to Xsolla's internal information. On information and belief, he had already collected much of the above confidential and trade secret information prior to his departure. However, it is believed that Andry and Tugushev remained in contact with Golubitsky, and they collectively planned for Andry and Tugushev to gather the remaining information they needed to start a competing company before Andry and Tugushev also left Xsolla.

44.    Upon his termination, Golubitsky signed a Separation Agreement dated June 7, 2023, which includes Section 4(b). Section 4(b) is a covenant covering proprietary information. The covenant states:

> Employee agrees to maintain as strictly confidential all non-public information belonging or pertaining to Company ("Confidential Information"), and not to use or disclose such information for any purpose unless required by law. Confidential Information includes, without limitation, the following types of non-public information or material regarding Company or its subsidiary or affiliated companies: financial information, including cost and performance data, debt arrangement, equity structure, investor information and holdings; corporate information, including plans, strategies, policies, contract terms, customer lists, client information, resolutions, and any negotiations; marketing information, including strategies, methods, prospects or market research data; project information; and private personnel information. This provision shall supplement, but shall not

supersede, any existing confidentiality and invention assignment provisions between Employee and Company.

45.    In June 2023, Andry's and Tugushev's employment with Xsolla ceased. After that time, their authorization to access Xsolla's internal information was removed. It is believed that Andry and Tugushev spent much of their last month at Xsolla secretly working with Golubitsky to start up a competing company and collecting all of the additional data and information they needed to copy Xsolla's business. All three of them knew that they could not use this information to start up a competing company. However, each chose to breach their obligations to and agreements with Xsolla, immediately using the confidential, proprietary and trade secret information each had collected to develop their own competing company— Aghanim.

46.    Xsolla is conducting an ongoing investigation into Aghanim's founders' access in the months preceding and following the end of their employment with Xsolla. As part of this investigation, Xsolla reviewed its systems and interviewed employees, customers, and contacts in the market. This investigation has provided Xsolla with strong evidence of Aghanim's and Tugushev's misappropriation. Indeed, Xsolla found evidence that from October 2022 through April 2024, Golubitsky, Andry and Tugushev accessed, downloaded, copied, and/or forwarded internal and highly sensitive information from Xsolla into their personal possession (and to systems outside of Xsolla's).

47.    For example, on October 21, 2022, Andry used his Xsolla work email to send to his personal (non-Xsolla) email a link to JIRA, an internal platform used by Xsolla for project management, containing a whole host of trade secret information, including links to Sales Force, Github (Xsolla's confidential coding repository), and Loonshots (Xsolla's research and development project management platform that tracks ideas and improvements on Xsolla's service offerings in the process of being

developed), providing himself with unrestricted access to these highly proprietary and trade secret data repositories outside of the work setting.

48.    Further, in the months after he left Xsolla, Tugushev continued to access a dummy Publisher account originally created to assist him in his work at Xsolla Labs, but improperly using his personal email, albert@tugushev.ru (as opposed to the required work email). This gave him continued access to non-public Xsolla information, including a confidential and proprietary a list of payment platform partners supported by Xsolla. Tugushev wrongfully continued to access this dummy account through October 2023—nearly 5 months after he left Xsolla. Tugushev's access of this list on his own behalf, and for the benefit of Aghanim, gave Aghanim access to non-public information necessary to the functioning of Xsolla's Pay Station, which Aghanim has now mimicked in its own competitive offerings.

49.    In March 2024, a few days after this lawsuit was filed (and almost 1 year after he left Xsolla), Tugushev created a second dummy account using a different email address, Tugushev-3zbg9@rambler.ua, to continue to access Xsolla's Publisher platform (pretending to be a publisher of games and pretending to want to enter into a business relationship with Xsolla as merchant of record). This account gave Tugushev continued access to non-public Xsolla information available only to customers, which was then used by Aghanim.

50.    Based off of Xsolla's investigation to date, and according to Xsolla's Publisher access log, Tugushev accessed Publisher via dummy accounts on at least 13 separate occasions after his termination, accessing at least 19 different web pages and engaging in hundreds of views of Xsolla materials. Xsolla's investigation remains ongoing.

51.    Xsolla's investigation thus far has shown that Golubitsky, Andry, and Tugushev caused Xsolla's confidential, proprietary and trade secret information to be transmitted to their personal accounts and personal possession, much of which occurred after they had left Xsolla. This includes information regarding Xsolla's:

16

a.    Pricing structure for customers;

b.    Pricing and revenue models for different features;

c.    Pay Station (Xsolla's checkout tool);

d.    World tax compliance algorithm and VAT merchant of record services;

e.    Fraud protection and monitoring algorithm;

f.    Site Builder;

g.    In-Game Services;

h.    Web Shop;

i.    Personalization Tools;

j.    Marketing Solutions;

k.    Customers, including: contact information, customer needs, most requested features, price tolerance, negotiated pricing, and other sensitive information about customers or potential customers; and

l.    Confidential and trade secret offerings that were/are in-development and not yet launched.

52.    Aghanim then used this information to develop matching offerings, including:

a.    Creating identical SKU management services;

b.    Creating identical promo codes and offers features;

c.    Copying Xsolla's Loonshot about marketing partners and using technology influencers;

d.    Copying the flow of Xsolla's instant webshop;

e.    Copying a Loonshot that described a way to speed up Xsolla's instant webshop;

f.    Copying Loonshots that involved integrating low-code and AI in a game hub builder;

g.    Copying a Loonshot from late 2022 for a calendar that mapped holidays and events;

17

h.   Copying a Loonshot for customization of automated promo campaigns;

i.   Copying a Loonshot related to personalization of tools for individual game players;

j.   Copying a Loonshot related to translation of item descriptions to local language using AI;

k.   Copying a Loonshot related to player personalization based on achievements;

l.   Copying a Loonshot for AI co-pilot of a webshop;

m.   Copying a Loonshot related to partner referrals;

n.   Copying a Loonshot related to partnering with marketing agencies; and

o.   Building Aghanim Experts by copying a Loonshot for an identical idea.

53.   Essentially, Aghanim founders gave themselves a free "how-to" guide for starting up a competing video game billing and distribution solution – without having to develop any of it themselves or bankroll its tens of millions of dollars' worth of research and development.

54.   Xsolla did not know about Golubitsky's, Andry's and Tugushev's efforts to steal Xsolla's trade secret and confidential information. Had Xsolla known, it would have terminated all three men effective immediately and demanded the return of all misappropriated information, amongst other mitigative actions.

**Aghanim**

55.   On July 15, 2023, Xsolla first heard of Aghanim. At the time, Xsolla did not have many concerns because it assumed that Aghanim would take years to lawfully build a platform similar to Xsolla's and assumed that it would do so lawfully. Unfortunately, Xsolla soon discovered that Aghanim's founders (Golubitsky, Andry, and Tugushev) had used Xsolla trade secrets to develop their own company.

SECOND AMENDED COMPLAINT

56.    Within merely 2 months of the Aghanim founders' exit from Xsolla, Aghanim started soliciting potential investors and falsely advertising itself as the "new Xsolla."

57.    Aghanim advertised a browser-to-app payment platform that it claimed could be developed quickly, likely within a year. Aghanim leveraged Xsolla's trade secret and confidential information to develop its video game service and payment platform in record time. Of course, armed with a business plan and the blueprint for a successful video game service and payment platform, Aghanim gained massive investments from large investors, venture capital firms, and tech accelerators, including A16Z Games' Speedrun accelerator, Point72 Ventures, Bessemer Venture Partners, and Bolt by QED.

58.    Aghanim also advertised itself to investors as "Shopify for Mobile Games." It emphasized its founders' experience in fintech and an ability to help potential customers avoid the "30% tax" game publishers pay to the Apple App Store and Google Play Store for in app purchases. This is the same technology that Xsolla already developed.

59.    Aghanim also advertised the "opportunity to become the biggest commerce engine in [the] video game mobile-to-web direct-to-consumer segment." This again was part of Xsolla's research and development that Aghanim's founders were well aware of and intimately involved in prior to their departures from Xsolla.

60.    Based on Xsolla's experience in the market, it takes competitors years to develop a platform capable of hosting the features Aghanim claimed it could offer. It would be impossible for a competitor, such as Aghanim, to create a platform so similar to Xsolla's in less than a year.

61.    Aghanim's founders also prominently featured (on multiple occasions) their past employment at Xsolla, in a clear attempt to profit off their former affiliation with the company. A true and correct copy of the Aghanim Investor Advertisement is attached as **Exhibit A**.

19

**SECOND AMENDED COMPLAINT**

62.    Aghanim began to advertise itself to potential customers as early as August 2023 (only 3 months after Golubitsky left and only 2 months after Andry and Tugushev left Xsolla). With Xsolla's name plastered all over Aghanim's material and Aghanim advertising substantially similar technology and services, Xsolla's customers began to wonder whether the companies were affiliated or otherwise part of the same entity. As a result, Xsolla customers inquired as to the relationship between the companies, which has led to awkward conversations about Xsolla's former employees and Aghanim and has required significant efforts to address customer confusion engendered in the market by Aghanim's misleading marketing techniques.

63.    Beginning as early as August 2023, Aghanim focused its marketing towards soliciting Xsolla's existing customers. Aghanim's standard marketing solicitation informed the Xsolla customer of Aghanim's launch of a product with extremely similar features to Xsolla, but at a reduced cost.

64.    These prices directly undercut Xsolla's pricing, even for its largest customers.

65.    The only way Aghanim could have effectively undercut Xsolla's pricing for similar products and services was through the theft of confidential and trade secret information related to Xsolla's complex and non-public pricing formula, as well as information stored in Xsolla's Sales Force database – including specifically its customer-specific pricing and details on customer negotiations. Aghanim's founders had unrestricted access to all of this information during their respective tenures at Xsolla.

66.    In interviewing industry members and customers as part of its investigation, Xsolla has discovered that Aghanim has offered pricing to several customers designed to undercut Xsolla and presented to at least one Xsolla customer the details of Xsolla's complex and proprietary pricing formula, explaining exactly how and where Xsolla makes a profit. This complex pricing formula is only accessible

to individuals, including Aghanim's founders, who have signed a confidentiality or non-disclosure agreement with Xsolla (this information is not even available cross-customers, as pricing is considered a confidential matter that cannot be shared by a customer). In response to Aghanim's presentations, customers are coming to Xsolla and asking for price matching and discounts.

67.    After April 2024, Aghanim hired Andry Kalugin, a former Xsolla employee in charge of business development in the Commonwealth of Independent States ("CIS"). With Kalugin and the founders' help, Aghanim has used Xsolla's Sales Force information including offered pricing and customers' reported issues, problems, and expectations to aggressively solicit Xsolla customers. For example, shortly after Kalugin joined Aghanim, Aghanim held 9 meetings with known Xsolla customers in the span of 2 days, leveraging Sales Force data in these meetings. Aghanim is currently using the same non-public information to pitch additional Xsolla customers.

68.    By way of another example, one Xsolla customer has informed Xsolla that Aghanim told them that Aghanim could move game users from mobile game to Web Shop while having login information follow the users. This is an issue this Xsolla customer was concerned about and voiced to Xsolla and an Xsolla employee had logged the same information into Sales Force. Aghanim would only have known this information by specifically reviewing information logged on Sales Force because none of the Aghanim founders nor Kalugin had a personal relationship with this Xsolla customer while at Xsolla. Aghanim also falsely represented to this Xsolla customer that Xsolla could not offer this feature.

69.    In another instance, Aghanim contacted a different Xsolla customer, specifically reaching out to Xsolla's confidential contact person at this customer. This individual's contact information is not public information as this person is so embedded at customer's company that one could not determine this individual's role from LinkedIn or any other public search, and none of the Aghanim founders nor

Kalugin had a personal relationship with this Xsolla customer or the customer's employee while at Xsolla. The only way Aghanim could have obtained this information for use was via Xsolla's Sales Force database.

## Aghanim's Launch

70.    On February 14, 2024, a mere eight (8) months after Aghanim's principals left Xsolla, Aghanim soft launched its direct-to-consumer platform. This platform ostentatiously offered several features:

a.    A platform that enables mobile game developers to create web-based game hubs and deliver personalized offers, while engaging player communities with a variety of metagame experiences such as news, leaderboards, achievements, daily rewards, and other upcoming features; and

b.    For publishers, Aghanim's advertised platform offered merchant of record commerce support, meaning that Aghanim takes care of the back-office financial tasks related to fraud, taxes, regulatory compliance, currency exchange, and other aspects of accepting payments for cross-border transactions.

71.    These offerings are eerily identical to Xsolla's proprietary personalization tools, merchant of record services, worldwide tax compliance algorithms, and fraud protection tools. Xsolla knows that these tools take massive amounts of time and money to develop and many rounds of trial and error to create functioning algorithms, let alone the highly evolved features Xsolla has developed over the past 18 years. For example, worldwide tax compliance requires collecting data on tax collection from hundreds of states, provinces, regions, territories, etc. across the globe and figuring out the precise algorithm that will allow the app to differentiate the amount of tax to be collected based on the credit card (or other forms of payment) address. This is easier said than done. Xsolla knows from experience that this is an extremely arduous

task that requires countless hours and resources to create a useable product that will successfully collect the appropriate amount of taxes from each gamer without causing regulatory risk. Besides Xsolla, no company in the independent video game developer and producer market has successfully created such a platform while also registered as the merchant of record to pay the VAT taxes. Put otherwise, Aghanim could not possibly have created such a worldwide tax or regulatory compliance tool and registered itself in hundreds of jurisdictions as the merchant of record in less than a year, as it claims to have done, without Xsolla's confidential and trade secret information.

72. Aghanim created these features in record time (with only its founders and 3 other potential employees). It would simply be impossible to independently research, develop, and test this technology in only 8 months. *See Moement, Inc. v. Groomore, Inc.*, No. 2:22-CV-02871-MWF (JEMx), 2022 WL 18284405, at *6 (C.D. Cal. Nov. 29, 2022) (finding misappropriation adequately pled because impossible speed of development is circumstantial evidence of improper use); *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 849 (N.D. Cal. 2019), modified in part, No. 5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019) (granting preliminary injunction finding trade secret claim had a likelihood of success on the merits where the defendant had created autonomous vehicle technology in ten weeks, where it took plaintiff's company eighteen months); *Sargeent Fletcher, Inc. v. Able Corp.*, (2003) 110 Cal. App. 4th 1658 (Cal. Ct. App. 2003) ("The plaintiff can introduce a variety of evidence to raise an inference of improper use: it can demonstrate that defendant had access to its trade secret; that the defendant's design mirrors the plaintiff's design; that the defendant could not have discovered the intricate details of the plaintiff's design independently or through reverse engineering from publicly available material; that the defendant's design configuration is one of many that were possible and matches the plaintiff's design; **or that the defendant designed the product in less time than typically required to complete the trial and error process of**

**independent derivation or reverse engineering.**") (emphasis added); *Ajaxo Inc. v. E\*Trade Group, Inc.*, 135 Cal. App. 4th 21, 54 (Cal. Ct. App. 2005) (finding substantial evidence to support jury verdict of misappropriation, given previously exclusive technology that was developed by a competitor in "too short a time for independent development.").

73. Aghanim's rapid "achievements" with only 3 employees have led many of Xsolla's customers to question whether the companies are related or otherwise shared technology to facilitate such rapid growth. This was cause for concern as many of these customers rely on Xsolla to maintain the utmost privacy and security, particularly with regard to customer payment information.

74. Simply put, Aghanim could not have developed its platform offering in such a short time without the improper use of Xsolla technology, trade secrets, and confidential information.

75. Aghanim's advertised core product suite, as stated in their February 14, 2024 "soft launch" press release, includes:

a. **Game Hub Builder**: a code-free website creation tool that empowers game studios to establish a captivating web-based home for their mobile games. Based on Aghanim's description of the tool, this offers the same services and features as Xsolla's Site Builder;

b. **Player Segmentation**: a sophisticated system that categorizes players based on behavior, preferences, and engagement patterns. Aghanim allegedly developed a tool that allows studios to use this information to tailor their strategies, optimize monetization, and enhance overall game experience. Based on Aghanim's description of this tool, this tool uses the functions and emphasizes the same features as Xsolla's personalization tools, consumer data analysis tools, and Advanced Analytics Tools. Aghanim used information that its founders acquired during their employment at Xsolla, specifically research and

development, to create a player feedback tool that mimics Xsolla's proprietary tools;

c. **SKU Management**: Aghanim claims it can simplify the management of stock-keeping units (SKUs) for game studios to streamline the process of tracking inventory, sales, and revenues. Aghanim claims that it can handle all back-office financial work involved in sales through this tool. Based on Aghanim's description of this tool, Aghanim is offering a tool that can pinpoint the best approach to maintaining the back end "inventory" for video game developers and publishers. Xsolla knows that this kind of tool takes large amounts of data and very precise algorithms to create. It would be impossible for Aghanim to develop a new SKU Management Tool so quickly without large amount of data or an existing algorithm. On information and belief, Aghanim used information that its founders improperly acquired during their employment at Xsolla, to create a tool that effectively operates exactly like Xsolla's proprietary tools (including, Xsolla's In-Game Store and Xsolla's Web Shop);

d. **Billing Engine**: Aghanim advertised that it had "[a] mobile-first checkout experience, built with an obsession for constant optimization of distribution costs, offers the most valuable payment options, including credit cards, ACH, Apple Pay, and others." Based on Aghanim's description of the Billing Engine, Aghanim has developed a checkout tool that can be plugged in to video games. Based on information and belief, Aghanim's billing engine tool is based on Xsolla's trade secret and confidential information on how to develop such a billing tool (including, Xsolla's Pay Station); and

e. **LiveOps Builder**: Aghanim advertised that it had groundbreaking marketing automation tools that keep players engaged and excited, including precise targeting of different player segments across channels

25

through tailored campaigns and individual offers. Based on information and belief, this tool is based on, among other things, Xsolla's Marketing Solutions focused on direct-to-consumer and targeted proprietary offerings, as well as Xsolla's research and development of the Xsolla Partner Network, a platform that connects developers to social media influencers and other strategic marketing partners.

A true and correct copy of the Aghanim's February 14, 2024, Press Release is attached as **Exhibit B**.

76.    Each of these services and tools offered in Aghanim's soft-launch core product suite and the other features advertised as part of Aghanim's soft-launch could only have been created through the improper use of Xsolla's trade secret and confidential information, including information Andry could access through the JIRA link he sent himself on October 21, 2022 (so that he could access confidential and proprietary information and documents outside the monitored and authorized work systems), as described above. Aghanim gained this trade secret and confidential information through its founders' improper misappropriation and disclosure of information taken prior to and after their departures.

77.    Aghanim has been using the detailed pricing and customer information contained in the material its founders took from Xsolla, as well as other confidential and proprietary information Aghanim's founders obtained while working for Xsolla, to interfere with Xsolla's customer relationships, take away its business opportunities, solicit Xsolla customers to do business with Aghanim instead, and unfairly and unlawfully compete in the independent video game developer and producer payment and services platform market. Aghanim has used this information to accelerate its growth and take advantage of Xsolla's built-in customer base. Aghanim would not have this technical information or built-in customer base but for Xsolla's confidential and trade secret information that it improperly acquired. Aghanim knew or had reason

**SECOND AMENDED COMPLAINT**

to know that its founders and agents acquired or obtained Xsolla's trade secrets by improper means.

### Aghanim's Website

78.    As of March 14, 2024, Aghanim has plastered Xsolla's name all over its website. For example, the website is "meta tagged" with Xsolla at least three times, meaning that Aghanim has coded its website to appear as a result in web searches related to Xsolla, directly benefitting from Xsolla's premium reputation in the industry. As another example, Xsolla's name is prominently displayed on the home page of the Aghanim website, leading some customers to believe that the companies are connected or affiliated with one another.

79.    Recently, Aghanim added a section to its website called "Advancements". Under this header, Aghanim offers services that include:

 a. **Aghanim Experts**—a hiring service for video game developers and producers;

 b. **Aghanim Connect**—an integration feature for third-party apps which allows video game developers and producers to incorporate advanced features into their game hubs; and

 c. **Aghanim Marketing Partners**—a marketing agency matching tool for video game developers and producers.

80.    Aghanim was able to offer these features in less than a year after launch through its use of Xsolla's trade secrets and confidential information, which include Xsolla's proprietary third party hiring and marketing tools and Xsolla's integration platform for third-party apps (that Aghanim's offerings now mirror). Each of these features is unique to Xsolla and required years of trial, error, and monetary investment to develop.

81.   As a direct result of Aghanim's and others' actions, Xsolla has suffered damages, including without limitation, loss of revenue, lost profits, and loss of customer goodwill.

### Aghanim's False Statements About Xsolla

82.   Aghanim continuously approaches Xsolla customers and potential customers that Aghanim's founders and Kalugin know Xsolla has relationships with and tries to convert them by disseminating incorrect information about Xsolla's inner workings, pricing and technical capabilities.

83.   Throughout 2023 and 2024, Aghanim has spread numerous disparaging rumors in the market and misrepresented their own capabilities to make their services seem better than Xsolla's. These false statements include:

a.   Spreading false rumors to Xsolla customers and potential customers that Xsolla is going bankrupt;

b.   Spreading false rumors that Xsolla's technology is unstable or antiquated;

c.   Spreading false rumors that Xsolla uses client money to fund other projects and does not invest in customer projects or commitments;

d.   Falsely representing to customers that the path to payment and path to services with Aghanim is shorter than with Xsolla;

e.   Falsely representing to customers that Xsolla's pricing formula contains hidden or improper fees;

f.   Falsely representing to customers that they could seamlessly move from mobile game to web-app with Aghanim, incorrectly indicating that Xsolla did not have this capability; and

g.   Misrepresenting to customers that Xsolla cannot handle their game and user personalization requirements.

84.   Xsolla is aware of at least one instance where Aghanim converted an existing Xsolla customer by claiming Xsolla could not handle the customer's needs.

This information was not true and Aghanim's founders knew it was untrue through their previous employment at Xsolla.

85.    In another instance, Xsolla was in the process of negotiating a contract and onboarding a potential customer when Aghanim approached that customer's parent company and misrepresented Xsolla's pricing, causing the customer to sign up with Aghanim instead. Xsolla lost a projected $75,000-100,000 annually due to Aghanim's interference and misrepresentations about Xsolla's pricing.

86.    Aghanim has also approached at least two other Xsolla customers with a pitch misrepresenting and undercutting Xsolla's pricing. As a result, Xsolla has had to expend resources to maintain the customer relationships and has had to provide the customers with a lower pricing model to maintain the relationships, resulting in damages to Xsolla.

<u>**CAUSES OF ACTION**</u>

**FIRST CAUSE OF ACTION**

**VIOLATION OF DEFEND TRADE SECRETS ACT ("DTSA")**

**18 U.S.C. §§ 1836, et seq.**

**(Against All Defendants)**

87.    Xsolla realleges and incorporates by reference the allegations stated in paragraphs 1 through 85 of this Complaint as though set forth in full herein.

88.    Xsolla is the owner of trade secrets, including:

a.    customer lists, customer-specific pricing information, and other customer information;

b.    pricing strategies for app purchases outside of the Apple App Store and the Google Play store;

c.    Pay Station (plug-in video game checkout tool);

d.    worldwide tax compliance algorithms;

e.    Site Builder platform;

**SECOND AMENDED COMPLAINT**

f.    Personalization Tools;

g.    In-Game Services;

h.    Web Shop;

i.    Marketing Solutions;

j.    Player segmentation and analysis algorithms;

k.    Xsolla's game developer hiring tool for its customers;

l.    Xsolla's marketing agency matching tool; and

m.    Xsolla's integration platform for third-party apps.

89.    All of these trade secrets were developed by Xsolla through years of trial, error, investment, and experience, costing tens of millions in research and development expenses.

## Misappropriation of Customer Information and Pricing

90.    Among Xsolla's customers are key players in the independent video game developer and producer industry. These customers highly value the security and services Xsolla offers. As part of this, Xsolla maintains confidential information about its customers in its files on Sales Force. This information is not merely a list of actual and potential customers.  Rather, it is a compilation of information about established customers that includes information such as: (1) each customer's name, (2) specific contact persons, (3) specific contact information, including addresses, telephone numbers, and emails, (4) details about the customer's products and how they use Xsolla's offerings, (5) detailed descriptions of all negotiations and service requests between Xsolla and each customer, and (6) any concerns or issues raised by the customer, as well as other details. Xsolla's files contain customer and pricing information that it has gathered over Xsolla's nearly 20 years in the industry and thousands of hours of research, trial, and error. Many of Xsolla's customers are regular and frequent consumers of Xsolla's services and have been so for years. Xsolla knows exactly how to customize its pricing and service offerings using this

confidential information and Xsolla's years of effort and investment in working with customers to create the most profitable and useful services for each individual customer. All of this has led Xsolla to remain competitive in the industry for nearly 20 years.

91.   Over nearly two decades, Xsolla has, through experience, investment, labor, and experimentation, developed a confidential and proprietary pricing scheme tailored from small to medium to high-volume customers alike. Xsolla provides competitive rates and innovative solutions not available elsewhere in the industry. This pricing scheme provides Xsolla with a sustainable revenue stream. In addition to a confidential and proprietary services pricing formula that took many years and much effort and experimentation to develop, Xsolla also has negotiated special, preferred pricing with long-term and high-volume customers.

92.   New competitors in the field take years to build up lesser customer models. Quick development of an identical model to Xsolla's would take years of independent investigation and review into customer desires, building connections with customer personnel, and discovering customer needs. This information could not be gained in several months for dozens of customers (especially given how targeted Aghanim has been in approaching key customer contacts embedded within Xsolla's customer companies and not publicly known). The only way to develop many of these prospective customer relationships is to build up an extensive business development team with contacts throughout the industry and through years of experience with the customer and the nurturing and building of relationships with key customer personnel (some of whose decision making authority is not known to the public). Xsolla has built up such a team over its 20-year history. Aghanim has not and relies on a very small business development team (a single former Xsolla employee who was recently hired).

93.   Aghanim acquired and used confidential client information from the founders, as well as Kalugin. Since his hiring, Kalugin, as an agent of Aghanim, has

met with many Xsolla customers, including holding 9 meetings with Xsolla customers within 2 days. Until the day he left Xsolla, Kalugin had full and complete access to Sales Force, which contains the specifics of customer pitches including offered pricing, issues, problems, and expectations. Aghanim is now using this non-public information to pitch Xsolla customers to terminate their business relations with Xsolla and sign up with Aghanim (the "new Xsolla").

94.    The thousands of files and information Aghanim's founders secretly obtained (and secured access to offline by forwarding to a founder's personal email) from Xsolla from late-2022 to present contain Xsolla's trade secrets and other confidential and proprietary information, including documents specifically marked internal and/or "confidential". The information obtained, includes, by way of example and without limitation: (i) Xsolla's proprietary pricing structure for regular, high-volume, and long-term customers; (ii) Xsolla's pricing formula for its suite of tools and services offered to video game developers and producers; (iii) Xsolla's customer list and preferences information; (iv) information regarding Xsolla's confidential contracts with customers; (v) Xsolla's customer feedback about various services and pricing; and (vi) customer pitches and customized presentations made to potential customers, all of which is stored in Sales Force.

95.    Xsolla's Sales Force database is a compilation of information that is a trade secret. Xsolla protects this information through password protections and by limiting access to only those employees needing access for their work roles.

96.    The above Sales Force information was used for Xsolla's pitches and presentations. Xsolla uses this information to tailor proposals to specific clients and their specific needs.

97.    Kalugin, Andry and Golubitsky, who are all now agents of Aghanim, had full and complete access to Sales Force, and before that Xsolla's proprietary CRM, an in-house business development opportunity tracking platform. They have now used this information to solicit and convert Xsolla's customers.

**SECOND AMENDED COMPLAINT**

98.    For example, one Xsolla customer has informed Xsolla that Aghanim told them Aghanim could move game users from mobile game to Webshop while having login information follow the users. This is an issue that the Xsolla customer was concerned about and voiced to Xsolla. Aghanim would only have known this information by specifically reviewing information logged on Sales Force because none of the Aghanim founders or Kalugin had a personal relationship or were involved with this Xsolla customer. Aghanim also falsely told the Xsolla customer that Xsolla could not offer this feature.

99.    In another instance, Kalugin contacted on behalf of Aghanim a different Xsolla customer whose account he was never responsible for and for which he had no known contact. Kalugin specifically reached out to Xsolla's contact person at this customer. This individual's contact information is not public information as this person is so embedded at the company that one could not determine this individual's role and authority from LinkedIn or any other public search. The only way Aghanim could have obtained this information was via Xsolla's Sales Force database.

100.  Xsolla's internal investigation thus far has uncovered at least 11 Xsolla customers solicited by Aghanim using non-public information about customer pitches and customer needs that could only be found through Xsolla's Sales Force data.

101.  This customer and pricing information taken by Aghanim's founders and agents, and now in the hands of and misappropriated by Aghanim, is not readily ascertainable through proper means, derives independent economic value because it is unknown to others, and Xsolla took reasonable measures to keep secret.

102.  This information is also not ascertainable through proper means because it is not capable of being reverse engineered without inside information.

103. Xsolla maintains the confidentiality of its client information through password protections and limiting access to highly sensitive and trade secret information to employees on a need-to-know basis, with username and password credentialling in place as well as different levels of access granted to different users

33

to prevent improper access. As high-level employees, Aghanim's founders and Kalugin had full access to customer information and pricing. Xsolla also implements detailed contractual obligations and agreements with its employees and other workers to ensure confidentiality, including the specific agreements Xsolla has with each of Aghanim's founders.

104. This information derives significant independent economic value from not being known to others because this information allows Xsolla to customize pricing and product offerings based upon individual customers' needs and challenges.

105. The information taken by Aghanim's founders represents trade secret information and was so at the time it was misappropriated by Aghanim.

### Misappropriation of Xsolla's Technical Information

106. Xsolla owns and possess certain confidential, proprietary, and commercially sensitive information as alleged herein, including, but not limited to:

a.   the research, development, testing, algorithms, specifications, and applications associated with its worldwide tax compliance algorithm;

b.   the research, development, testing, algorithms, specifications, and applications associated with its Pay Station (video game checkout tools);

c.   the research, development, testing, algorithms, technical code information, specifications, and applications associated with its Site Builder platform;

d.   the research, development, testing, algorithms, specifications, and applications of its Personalization Tools;

e.   the research, development, testing, algorithms, specifications, and applications of its In-Game Services;

f.   the research, development, testing, algorithms, specifications, and applications of its Web Shops;

g.    the research, development, testing, algorithms, specifications, and applications of its Marketing Solutions;

h.    the research, development, testing, algorithms, specifications, and applications of its Player segmentation and analysis algorithms;

i.    the research, development, testing, algorithms, specifications, and applications of its game developer hiring tool for its customers;

j.    the research, development, testing, algorithms, specifications, and applications of its marketing agency matching tool; and

k.    the research, development, testing, algorithms, specifications, and applications of its integration platform for third-party apps.

107. Such information, as listed above, is depicted, revealed, and/or reflected in, among other things, Xsolla's back-end files, algorithms, data, and other confidential, internal research and development documents for its products and services.

108. This technical information taken by Aghanim's founders and agents, and now in the hands of and being improperly used by Aghanim is not readily ascertainable through proper means, derives independent economic value because it is unknown to others, and Xsolla took reasonable measures to keep it secret.

109. This information is not ascertainable through proper means because it is kept confidential by Xsolla and is not capable of being reverse engineered without inside information. In particular, the coding and algorithms underlying Xsolla's offerings are highly specific and technical and could not be successfully mirrored in a matter of mere months without direct copying. Much of this information is found in the JIRA system, a link to which one of the Aghanim founders sent to his personal email in order to access all of the thousands of confidential and proprietary information offline and outside the monitoring systems at Xsolla. This information derives significant independent economic value from not being known to others because this information constitutes the core of Xsolla's entire value proposition to

35

customers. Xsolla is exceedingly successful after nearly 20 years in the industry as a result of the value provided by its offerings.

110. Aghanim's quick development of similar technology and resources is evidence of its misappropriation of trade secrets because Aghanim had an impossible development timeline. It takes competitors years to develop similar and inferior tools. It would be impossible for a competitor, such as Aghanim, to create from scratch nearly identical offerings in less than a year. *See Moement, Inc. v. Groomore, Inc.,* No. 2:22-CV-02871-MWF (JEMx), 2022 WL 18284405, at *6 (C.D. Cal. Nov. 29, 2022) (finding misappropriation adequately pled because impossible speed of development is circumstantial evidence of improper use); *WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 849 (N.D. Cal. 2019), modified in part, No. 5:18-CV-07233-EJD, 2019 WL 5722620 (N.D. Cal. Nov. 5, 2019) (granting preliminary injunction finding trade secret claim had a likelihood of success on the merits where the defendant had created autonomous vehicle technology in ten weeks, where it took plaintiff's company eighteen months); *Sargeent Fletcher, Inc. v. Able Corp*., 110 Cal. App. 4th 1658 (Cal. Ct. App. 2003) ("The plaintiff can introduce a variety of evidence to raise an inference of improper use: it can demonstrate that defendant had access to its trade secret; that the defendant's design mirrors the plaintiff's design; that the defendant could not have discovered the intricate details of the plaintiff's design independently or through reverse engineering from publicly available material; that the defendant's design configuration is one of many that were possible and matches the plaintiff's design; **or that the defendant designed the product in less time than typically required to complete the trial and error process of independent derivation or reverse engineering**.") (emphasis added); *Ajaxo Inc. v. E\*Trade Group, Inc*., 135 Cal. App. 4th 21, 54 (Cal. Ct. App. 2005) (finding substantial evidence to support jury verdict of misappropriation, given previously exclusive technology that was developed by a competitor in "too short a time for independent development.").

36

111. With respect to measures to keep its information secret, Xsolla implemented detailed contractual obligations and agreements with its employees and other workers to ensure confidentiality, including the specific agreements Xsolla has with each of Aghamin's founders. Xsolla's confidential, proprietary and trade secret information is also restricted to employees and other workers on a need-to-know basis, with username and password credentialling in place as well as different levels of access granted to different users to prevent improper access. Given the executive Xsolla positions the Aghanim founders formerly occupied (e.g., CEO, CTO), they knew full well and were the architects and gatekeepers of many of these protective measures and understood the exact ways in which to avoid detection.

112. The information stolen by Aghanim's founders and used by Aghanim represents trade secret information and was so at the time it was misappropriated by Aghanim.

## Common Elements to all Trade Secrets

113. As detailed above, Xsolla is conducting an investigation into Aghanim's founders' access in the months preceding and following the end of their employment with Xsolla. This investigation has provided Xsolla with strong evidence of Aghanim's and Tugushev's misappropriation, including Andry's actions in sending himself a personal link to Xsolla's internal platforms (JIRA) containing confidential and trade secret customer and technological/proprietary information for access outside of the work setting and outside work systems, and Tugushev's actions in using several dummy accounts to maintain access to Xsolla's Publisher Account, which necessitated that he fraudulently pretend – on multiple occasions as recorded in logs – to be a publisher of games seeking to engage Xsolla as its merchant of record. This was done in an effort to gain access to Xsolla's cutting edge, novel and proprietary lay-outs, tailored monetization strategies, tools and pricing models, along with

detailed information regarding the over 700 various payment partners Xsolla has engaged with to offer worldwide services that is not otherwise publicly available.

114. Aghanim then improperly used this information to develop matching and competing offerings. This included:

 a. Creating identical SKU management services;

 b. Creating identical promo codes and offers features;

 c. Copying Xsolla's research and development ("Loonshot") about marketing partners and using technology influencers;

 d. Copying the flow of Xsolla's instant webshop;

 e. Copying a Loonshot that described a way to speed up Xsolla's instant webshop;

 f. Copying Loonshots that involved integrating low-code and AI in a game hub builder;

 g. Copying a Loonshot from late 2022 for a calendar that mapped holidays and events;

 h. Copying a Loonshot for customization of automated promo campaigns;

 i. Copying a Loonshot related to personalization of tools for individual game players;

 j. Copying a Loonshot related to translation of item descriptions to local language using AI;

 k. Copying a Loonshot related to player personalization based on achievements;

 l. Copying a Loonshot for AI co-pilot of a webshop;

 m. Copying a Loonshot related to partner referrals;

 n. Copying a Loonshot related to partnering with marketing agencies; and

 o. Building Aghanim Experts by copying a Loonshot for an identical idea.

115. Aghanim's founders are technologically savvy and took steps to bypass Xsolla's security measures in order to copy Xsolla materials. In addition to what

Xsolla has already uncovered in its investigation (which is on-going), Aghanim's founders may have used a variety of computerized technologies, such as third-party devices (i.e., cell phone videos and screen shots), and analog devices, such as a pen and paper, to copy or otherwise improperly obtain Xsolla's trade secrets for use by Aghanim. As such, additional evidence of misappropriation is uniquely and peculiarly within the possession and control of Aghanim and its agents.

116. Xsolla's investigation into Aghanim's misappropriation included attempting to track downloading and forwarding of links or files by known Aghanim agents. As described above, Xsolla found evidence that Aghanim's founders took such steps and that material available through these links and files was acquired and used by Aghanim.

117. Other evidence of Aghanim's misappropriation is peculiarly within the knowledge of the Defendants. Aghanim's founders are creative and knowledgeable in technology security. They are more than capable of hiding their digital footprint to prevent Xsolla from knowing how, when, or what they accessed.

118. For example, Golubitsky, as the former CTO of Xsolla, would have been able to use his knowledge of Xsolla security to take Xsolla information and hide his technological footprint by either not directly copying files, deleting his access log, or otherwise preventing Xsolla from tracking his activity.

119. As another example, the Aghanim founders had technological knowledge to know that information directly downloaded from certain Xsolla depositories, such as Sales Force, could be traced. To avoid such a trace, they likely logged into Salesforce, or another repository, took photos, screenshots, or videos with another device, or wrote it out with a pen and paper and then typed it out on an Aghanim device. Further, the Aghanim founders knew full well for how long activity logs on, for example Sales Force, were maintained, and as the architects and gatekeepers of Xsolla's technical security, they knew all too well how to circumvent detection.

120. Finally, the Aghanim founders could have created even more dummy accounts (separate from those uncovered to date) to maintain access to Xsolla information. This is a known practice of the Aghanim founders. For example, while still working for Xsolla, Tugushev created a dummy account to access Xsolla's Publisher platform, which included purporting to sign documentation (including a fake contract) to obtain more access. However, the signatures merely state "test" and were invalid. Remarkably and in brazen disregard for his legal obligations, Tugushev continued to access this dummy account months after his departure from Xsolla, up to October 2023 (4 months after he left Xsolla). Then, in March 2024, mere days after this lawsuit was filed, Tugushev created another new dummy account to repeatedly access non-public information about Xsolla. Golubitsky and Andry are both highly skilled and could easily have taken similar steps, including providing dummy accounts with administrative privileges to steal additional information from Xsolla for Aghanim's use, and then deleting such accounts before Xsolla discovered them.

121. Other than as set forth above, Xsolla cannot allege the additional ways in which Defendants acquired or used their trade secrets because only Defendants possess such information. *See Autodesk, Inc. v. ZWCAD Software Co., Ltd.*, No. 5:14-cv-01409-EJD, 2015 WL 2265479, at *6 (N.D. Cal. May 13, 2015) ("it would be unreasonable to require a plaintiff to demonstrate the precise ways in which Defendants may have used their trade secrets given that Defendants are the only ones who possess such information").

122. Xsolla knows from its investigation to date that the files and information Aghanim's founders secretly downloaded or otherwise obtained from Xsolla contain Xsolla's trade secrets and other confidential and proprietary information, including documents specifically marked internal and/or "confidential". The information obtained, includes, by way of example and without limitation: files, algorithms, data, and other internal research and development documents; client contact and contract information; and Xsolla pricing methods and practices.

40

123. Aghanim improperly acquired Xsolla's trade secrets from its founders and agents and knew or had reason to know that its founders and agents acquired or obtained the trade secrets by improper means. Aghanim also used and/or disclosed Xsolla's trade secrets, without Xsolla's consent, using improper means to acquire knowledge thereof. At the time of Aghanim's use of the trade secrets, Aghanim knew or had reason to know that the knowledge of the trade secret was: (a) derived from or through a person who had used improper means to acquire the trade secret; (b) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret; and/or (c) derived from or through a person who owed a duty to Xsolla. Also, at the time of Aghanim's disclosure and use of the trade secrets, it knew or had reason to know that the trade secrets were trade secrets and its knowledge of the trade secrets had been acquired by improper means. As set forth above, Aghanim improperly and unscrupulously used Xsolla's trade secrets for the purpose of setting up a competing independent video game payment and services platform business, and soliciting and poaching Xsolla's customers.

124. As alleged above, Tugushev improperly acquired, used and disclosed Xsolla's trade secrets to Aghanim and knew that doing so would breach his Independent Contractor Agreement and nondisclosure obligations to Xsolla. Specifically, taking advantage of his position as CTO of Xsolla Labs, Tugushev used his broad access rights to download, copy, or otherwise improperly take Xsolla's trade secrets. Then, upon exiting Xsolla, Tugushev routinely and improperly continued to acquire and disclose Xsolla's trade secret information to Aghanim for use in the development of a directly competitive platform, by way of accessing Publisher by way of 2 dummy accounts. Tugushev also used the trade secret information he obtained from Xsolla for the purpose of soliciting and poaching Xsolla's customers in violation of his Independent Contractor Agreement.

125. In so acting, Aghanim and Tugushev unjustly enriched themselves while simultaneously causing substantial harm to Xsolla. Aghanim's and Tugushev's

improper acquisition, use, and disclosure of Xsolla's trade secrets was a substantial factor in causing their own unjust enrichment and harm to Xsolla.

126. In committing the acts described above, Aghanim and Tugushev acted willfully and maliciously, warranting an award of exemplary damages, attorneys' fees, and costs.

## SECOND CAUSE OF ACTION
## VIOLATION OF CALIFORNIA UNIFORM TRADE SECRETS ACT ("CUTSA"), CAL. CIV. CODE § 3426
## (Against All Defendants)

127. Xsolla re-alleges and incorporates by reference the allegations stated in paragraphs 1 through 125 of this Complaint as though set forth in full herein.

128. As set forth above, Xsolla is the owner of trade secrets developed by Xsolla through years of trial, error, investment, and experience. This information is trade secret and was so at the time it was misappropriated by Aghanim.

129. As set forth above, Aghanim improperly acquired, used, and/or disclosed these trade secrets in several ways, including, without limitation, by downloading or otherwise obtaining trade secret materials from Xsolla's systems, improperly and unscrupulously using Xsolla's trade secrets for the purpose of setting up a competing independent video game payment and services platform business, and soliciting and poaching and/or attempting to poach Xsolla's customers. In so doing, Aghanim unjustly enriched themselves while simultaneously causing substantial harm to Xsolla.

130. As set forth above, Tugushev improperly acquired, used and/or disclosed these trade secrets in several ways, including, without limitation, by downloading or otherwise obtaining trade secret materials from Xsolla's systems, improperly and unscrupulously using Xsolla's trade secrets for the purpose of setting up a competing independent video game payment and services platform business, and soliciting and

poaching Xsolla's customers. In so doing, Tugushev unjustly enriched himself while simultaneously causing substantial harm to Xsolla.

131.  Aghanim's and Tugushev's improper acquisition, use, and disclosure of these trade secrets was a substantial factor in causing their unjust enrichment and harm to Xsolla.

132.  In committing the acts described above, Aghanim and Tugushev acted willfully and maliciously, warranting an award of exemplary damages, attorneys' fees, and costs.

### THIRD CAUSE OF ACTION
### INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE
### (Against All Defendants)

133.  Xsolla re-alleges and incorporates by reference the allegations stated in paragraphs 1 through 131 of this Complaint as though set forth in full herein.

134.  Xsolla had economic relationships with several of the companies that Aghanim attempted to solicit away from Xsolla.

135.  As alleged above, Aghanim continuously approaches Xsolla customers and potential customers that Aghanim's founders and agents know Xsolla has relationships with and tries to convert them by providing false information about Xsolla's inner workings, pricing and technical capabilities.

136.  Further, Xsolla has economic relationships with each of these customers of Xsolla products and services that hold the promise of future economic advantage to Xsolla: these companies purchase Xsolla services and products and, as a result, will likely continue to purchase Xsolla's forthcoming products and services, including browser-to-app payment platforms, in the future. Given these companies' evolving needs, these companies will likely need to upgrade to new Xsolla services and updated products, such as new fraud protection and browser-to-app payment platforms, over

43

time. Because of their established relationship with Xsolla and the stickiness of the customer relationship in the independent video game developer payment support platform industry, the former customers of Xsolla's products and services (who relied on Xsolla for customer support day in and day out) had a strong likelihood of purchasing Xsolla's next-generation services and products in the future.

137. Aghanim, through its principals and agents, were well aware of all of these companies' economic relationships with Xsolla, and they expressly used Xsolla in their pitches.

138. As alleged above, Aghanim and Tugushev intentionally acted to disrupt Xsolla's relationships with the companies that purchase Xsolla's payment support platform services and products by spreading disparaging and false rumors in the market and misrepresenting their own capabilities to make their services seem better than Xsolla's.

139. Aghanim's and Tugushev's wrongful conduct did actually disrupt the aforementioned relationships by attempting to steal Xsolla's existing customers and diverting (potential) customers away from Xsolla and to Aghanim. This misconduct disrupted the relationships by making it more difficult to maintain client relationships and costing Xsolla the opportunity to develop potential customers of its products and services.

140. As a direct and proximate result of Aghanim's and Tugushev's misconduct, Xsolla has lost two customer relationships completely. For other relationships, Xsolla has been forced to reduce its pricing to save the relationship.

141. As a direct and proximate result of Aghanim's and Tugushev's misconduct, Xsolla has suffered and continues to suffer economic harm and damages from the lost revenue related to at least two customer relationships and from having to reduce pricing for other customers and in an amount to be determined at trial, as well as attorneys' fees and costs.

142. Xsolla was, and continues to be, economically harmed as a direct result of Aghanim's and Tugushev's wrongful conduct.

143. Aghanim's and Tugushev's actions were undertaken with fraud, malice or oppression, or with a conscious disregard of Xsolla's rights, and, therefore, Xsolla is entitled to an award of exemplary and punitive damages against Aghanim.

## FOURTH CAUSE OF ACTION
## INTENTIONAL INTERFERENCE WITH CONTRACT
### (Against all Defendants)

144. Xsolla re-alleges and incorporates by reference the allegations stated in paragraphs 1 through 142 of this Complaint as though set forth in full herein.

145. Xsolla entered into agreements with customers for Xsolla's services and products. Aghanim knew of those contracts. Aghanim's conduct made performance of those contracts more expensive or difficult. Aghanim intended to disrupt the performance of the contracts or knew that disruption of performance was certain or substantially certain to occur.

146. As alleged above, Xsolla had a valid customer contract with one customer for the provision of Pay Station and other services. As former Xsolla executives, the Aghanim founders were well aware of this client relationship. Defendants took intentional acts designed to induce a disruption of the customer relationship with Xsolla by spreading disparaging and false rumors in the market and misrepresenting Aghanim's capabilities to make its services seem better than Xsolla's.

147. As a result of Aghanim's and Tagirovich's wrongful acts, Xsolla has suffered harm, losing the customer account and the associated revenues. Aghanim's wrongful acts were a substantial factor in causing harm to Xsolla.

148. Aghanim's and Tugushev's above-described actions were taken with malice, oppression, fraud, and/or a reckless disregard for Xsolla's rights.

149.  Aghanim is liable for punitive damages because the actions taken with malice, oppression, fraud, and/or a reckless disregard for Xsolla's rights were committed by one or more officers, directors, or managing agents acting on Aghanim's behalf, were authorized by one or more officers, directors, or managing agents, and/or were adopted or approved by one or more officers, directors, or managing agents after they learned of the conduct. Xsolla is thus entitled to an award of punitive damages against Aghanim.

150.  Tugushev is liable for punitive damages because the actions were taken with malice, oppression, fraud, and/or a reckless disregard for Xsolla's rights.

151.  Xsolla is thus entitled to an award of punitive damages against both Tugushev and Aghanim.

## FIFTH CAUSE OF ACTION
## UNFAIR COMPETITION
## CAL. BUS. & PROF. CODE §§ 17200, *et seq.*
### (Against all Defendants)

152.  Xsolla re-alleges and incorporates by reference the allegations stated in paragraphs 1 through 150 of this Complaint as though set forth in full herein.

153.  Aghanim's and Tugushev's actions described herein, constitute unlawful, unfair, and/or fraudulent business practices pursuant to California's Unfair Competition Law, California Business and Professions Code §§ 17200, et seq. (the "UCL") including:

a.    Aghanim's and Tugushev's use of confidential customer information;

b.    Aghanim's and Tugushev's solicitation of Xsolla customers;

c.    Aghanim's and Tugushev's improper reference to Xsolla's name in their solicitation of customers and advertisement;

d.    Aghanim's improper references to Xsolla's name on its website;

e.     Aghanim's fraudulent representations regarding Xsolla's capabilities; and

f.     Aghanim's and Tugushev's misrepresentation of their independent capabilities to develop video game payment and support platforms. Specifically, Defendants are misrepresenting to customers Aghanim's current capabilities and tools. In other words, Defendants are claiming Aghanim has tools that do not yet exist.

154. To the extent Aghanim is not capable of its advertised features, Aghanim falsely and misleadingly advertised its capabilities and technological developments to improperly compete with Xsolla in violation of the UCL.

155. In the alternative, Aghanim and Tugushev have taken additional unfair and fraudulent actions by disparaging Xsolla and spreading false rumors about Xsolla to Xsolla customers, potential customers, and in the marketplace, as alleged above.

156. Consequently, Aghanim's and Tugushev's actions constitute unfair competition for purposes of the UCL.

157. As a proximate result of Defendants' actions, Xsolla business development personnel are being forced to expend extra efforts to counter rumors spread by Aghanim. Aghanim's rumors have resulted in harm to Xsolla's brand and goodwill in the marketplace. As a result of these rumors, Xsolla has lost at least one customer account, which has switched to Aghanim, and also lost another potential account right as the contract was to be signed.

158. As a proximate result of Aghanim's and Tugushev's actions, Xsolla has suffered injury in fact, including without limitation, damages in an amount to be proven at trial as well as loss of profits, customers, employees, goodwill, property, and prospective economic advantage.

159. Xsolla is entitled to (a) recover restitution, including without limitation, the disgorgement of all benefits and profits that Aghanim received as a result of their

47

violation of the UCL, and (b) an injunction restraining Aghanim from engaging in further acts of unfair competition.

### SIXTH CAUSE OF ACTION
### FEDERAL TRADEMARK INFRINGEMENT
### 15 U.S.C. § 1114
#### (Against Aghanim)

160. Xsolla re-alleges and incorporates by reference the allegations stated in paragraphs 1 through 158 of this Complaint as though set forth in full herein.

161. Xsolla is the owner of the standard character mark "Xsolla" for International Class 035 and U.S. Classes 100, 101, 102 with registration number 4567040 (the "Registered Mark"). The Registered Mark is designated for business administration and management, namely management, administration, provision of analytics and consulting with regard to price management, marketing, customer billing and payment options, and customer service.

162. From October 2023 to present, Aghanim has published press releases signaling a relationship between the Registered Mark and Aghanim, which has and will cause confusion with customers in the marketplace.

163. Aghanim's website has also meta-tagged the Registered Mark at least three times. This causes Aghanim to show up when googling for "Xsolla" and associated terms.

164. Aghanim's website also prominently displays Xsolla's name and features renamed versions of Xsolla's offerings which has led some Xsolla customers to believe that the companies are affiliated. This has caused customer confusion as to whether Xsolla endorses, formed, or is otherwise related to Aghanim.

165. Without Xsolla's authorization, license, or consent, Aghanim has knowingly used and continues to use in commerce Xsolla's Registered Mark in connection with the adverting, promoting, and selling in the United States its products

and services. Aghanim has used Xsolla's Registered Mark with the knowledge of, and the intent to call to mind and create a likelihood of confusion with regard to, and/or trade off, Xsolla's fame and/or goodwill and Xsolla's Registered Mark. Indeed, Aghanim has expressly solicited customers by advertising itself as the "new Xsolla" and contacting known clients.

166.  Aghanim's use of Xsolla's Registered Mark is likely to: (a) confuse, mislead, or deceive customers, purchasers, and members of the general public as to the origin, source, sponsorship, or affiliation of Aghanim and Xsolla and/or the Aghanim's products and services and Xsolla's products and services; and (b) is likely to cause such people to believe in error that Aghanim's products and services have been authorized, sponsored, approved, endorsed, or licensed by Xsolla or that Aghanim's products and services are in some way affiliated with Xsolla.

167.  Xsolla has no control over Aghanim's use of Xsolla's Registered Mark and cannot control the fact that Aghanim is improperly using the Registered Mark to create the subject counterfeit products and that Aghanim continues to sell, offer to sell and/or distribute the subject products and services. Therefore, Xsolla's reputation and goodwill have been and continue to be damaged, and the value of Xsolla's Registered Mark jeopardized, by Aghanim's continued use of the Registered Mark and colorable imitations thereof.

168.  Because of the likelihood of confusion between Aghanim's products and services and Xsolla's Registered Mark, any defects, objections, or faults found with Aghanim's products and services will negatively reflect upon and injure the exceptional reputation that Xsolla has established for the products and services it offers in connection with Xsolla's Registered Mark. As such, Aghanim is liable to Xsolla for infringement of Xsolla's Registered Mark pursuant to 15 U.S.C. § 1114.

169.  Aghanim's acts alleged above have caused, and if not enjoined will continue to cause, irreparable and continuing harm to Xsolla's trademarks, business, reputation, and goodwill. Xsolla has no adequate remedy at law as monetary damages

are inadequate to compensate Xsolla for the injuries caused by Aghanim to its trademarks, business, reputation, and goodwill.

170. As a direct and proximate result of Aghanim's conduct, Xsolla has suffered and continues to suffer damages to its valuable Registered Mark, and other damages in an amount to be proven at trial.

171. Aghanim's infringement of Xsolla's Registered Mark is deliberate, willful, fraudulent and without any extenuating circumstances, and constitutes a knowing use of the Registered Mark as well as an exceptional case within the meaning of 15 U.S.C. § 1117(b).

172. Xsolla is entitled to permanent injunctive relief, as well as an award of Aghanim's profits, actual damages, enhanced profits or damages, costs, and reasonable attorneys' fees pursuant to 15 U.S.C. §§ 1114, 1116, and 1117.

## SEVENTH CAUSE OF ACTION
## BREACH OF CONTRACT
### (Against Tugushev)

173. Xsolla re-alleges and incorporates by reference the allegations stated in paragraphs 1 through 171 of this Complaint as though set forth in full herein.

174. On March 1, 2023 and again in May 2023, Xsolla entered into a written Independent Contractor Agreement with Tugushev, for good and valuable consideration, whereby Tugushev agreed, among other things: (1) not to disclose any confidential information of Xsolla or use any such information other than for purposes of work for Xsolla; and (2) that Xsolla owns all intellectual property rights for ideas, products or solutions developed during Tugushev's work for Xsolla relating to Xsolla's business.

175. As detailed above, Tugushev has intentionally breached – and continues to breach – the provisions of the Independent Contractor Agreement by disclosing

and/or using Xsolla's identical proprietary and trade secret information for the benefit of Aghanim in direct contravention of the Independent Contractor Agreement.

176. As a direct and proximate result of Tugushev's breaches of the Agreement, Xsolla has suffered and will continue to suffer harm, including the loss of confidentiality of its proprietary information, the loss of its advantageous competitive position in the industry, damage to its goodwill, and lost profits.

## PRAYER FOR RELIEF

WHEREFORE, Xsolla prays for judgment against Aghanim and Tugushev, as appropriate to each cause of action alleged, as follows:

1. For damages according to proof at trial, including general, special, economic, incidental, and consequential damages;

2. For exemplary and punitive damages, pursuant to DTSA, CUTSA, 15 U.S.C. § 1114, and California Civil Code § 3294;

3. For injunctive relief, including without limitation an injunction enjoining Aghanim from using Xsolla's trade secrets and other confidential and proprietary information for any purpose, including, without limitation, to compete or attempt to compete with Xsolla, and to solicit or attempt to solicit Xsolla's customers and employees, and from improperly using Xsolla's Registered Marks;

4. For seizure of property necessary to prevent the propagation or dissemination of Xsolla's trade secrets;

5. For the disgorgement of all investments, revenue and/or profits received by Aghanim as a result of its misappropriation of Xsolla's trade secrets and other confidential and proprietary information;

6. For imposition of a reasonable royalty for Aghanim's and Tugushev's unauthorized disclosure or use of Xsolla's trade secrets and other confidential and proprietary information;

**SECOND AMENDED COMPLAINT**

7. For return of Xsolla's trade secrets and other confidential and proprietary information from Aghanim and Tugushev;

8. For declaratory relief;

9. For attorneys' fees;

10. For costs and expenses;

11. For pre- and post-judgment interest at the applicable legal rate of interest; and

12. For such other, further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Xsolla hereby demands a trial by jury on all claims and issues so triable.

DATED:  October 1, 2024         BLANK ROME LLP


By: */s/ Dennis Ehling*
Dennis Ehling
Michael Iannucci (*Pro Hac Vice*)
Bridget Briggs (*Pro Hac Vice*)
Benjamin Wigley
Attorneys for Plaintiff
XSOLLA (USA), INC.

SECOND AMENDED COMPLAINT