O

# United States District Court
# Central District of California

| | |
|---|---|
| XSOLLA (USA), INC., | Case № 2:24-cv-02116-ODW (AGRx) |
| Plaintiff, | **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT ALBERT TUGUSHEV'S MOTION TO DISMISS AND DEFENDANT AGHANIM INC.'S MOTION TO DISMISS AND STRIKE [58] [60]** |
| v. | |
| AGHANIM INC. et al., | |
| Defendants. | |

## I.    INTRODUCTION

Plaintiff Xsolla (USA), Inc. ("Xsolla") brings this action alleging trade secret misappropriation, trademark infringement, interference with prospective economic advantage and contract, unfair competition, and breach of contract against Defendants Aghanim, Inc. ("Aghanim") and Albert Tagirovich Tugushev.  (Second Am. Compl. ("SAC"), ECF No. 55.)    Aghanim and Tugushev each move to dismiss Xsolla's claims against them, and Aghanim moves to strike certain allegations from the SAC. (Aghanim Mot., ECF No. 58; Tugushev Mot., ECF No. 60.)    For the reasons discussed below, the Court **GRANTS IN PART** and **DENIES IN PART** Aghanim's and Tugushev's motions.[1]

---

[1] Having carefully considered the papers filed in connection with the Motions, the Court deemed the matters appropriate for decision without oral argument.  Fed. R. Civ. P. 78; C.D. Cal. L.R. 7-15.

## II.    REQUEST FOR JUDICIAL NOTICE

Tugushev and Xsolla separately ask the Court to take judicial notice of certain exhibits.  (Xsolla Req. Judicial Notice ("Xsolla RJN"), ECF No. 65-2; Tugushev Req. Judicial Notice ("Tugushev RJN"), ECF No. 67-2.)  These requests are unopposed.

The Court "may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  Accordingly, the Court takes judicial notice of the following documents:

- Aghanim's "About Us" webpage, stating, "HQ in Los Angeles," (Xsolla RJN Ex. 3 ("Aghanim About Us"), ECF No. 65-5;
- Delaware Department of State webpage noting Aghanim's formation date, (Xsolla RJN Ex. 4 ("Aghanim Incorporation"), ECF No. 65-6;
- Xsolla's "Xsolla Family" webpage, identifying a Russian address for Xsolla LLC, (Tugushev Ex. F ("Xsolla Family"), ECF No. 67-5); and
- Xsolla's "Contact Us" webpage, listing global office locations, (Tugushev Ex. G ("Xsolla Contact Us"), ECF No. 67-6).

The parties also ask the Court take judicial notice of other documents.  (*See* Xsolla RJN; Tugushev RJN.).  Because the Court reaches its conclusions without relying on those documents, it denies those requests.  *See Migliori v. Boeing N. Am., Inc.*, 97 F. Supp. 2d 1001, 1004 n.1 (C.D. Cal. 2000) (declining to take judicial notice of exhibits that "do not affect the outcome of" the motion).

## III.    BACKGROUND[2]

### A.    Factual Background

Xsolla, a California company, is a global video game billing and distribution solution company that provides video game developers and publishers with payment,

---

[2] All factual references derive from Xsolla's SAC or attached exhibits, unless otherwise noted.  *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (stating that well-pleaded factual allegations are accepted as true for purposes of a motion to dismiss).

billing, distribution, support, and marketing technology for cross-platform video game businesses.   (SAC ¶ 19.)   Xsolla offers customers the use of various unique technologies, including:

- worldwide compliance tax algorithms that allow video game developers and publishers to charge and collect taxes from customers and pay those taxes to government entities;

- Pay Station, a checkout tool that enables fast, efficient transactions;

- an algorithm that identifies fraud;

- Site Builder, a tool that enables developers to create websites that include web-access for in-game purchases;

- Web Shop, a tool that enables purchases outside of the Apple App Store or Google Play Store;

- In-Game Services, a set of algorithms that enable developers and producers to set-up in-game purchase options;

- Personalization Tools, a series of tools that enable customers to receive player feedback and to optimize monetization; and

- a series of tools that assist with monetization.

(*Id.* ¶¶ 21–22.)

Constantin Andryushchenko ("Andry"), Konstantin Golubitsky ("Golubitsky"), and Tugushev all worked at Xsolla (collectively "Aghanim's Founders").  (*Id.* ¶¶ 2, 12 & n.1, 30, 35, 37, 45.)  Golubitsky started as a Team Lead more than a decade ago, later serving as Xsolla's CTO and then CEO.  (*Id.* ¶ 30.)  In 2016, Andry began working at Xsolla and later became CEO of Xsolla Labs, an Xsolla subsidiary.  (*Id.* ¶ 35.)  In 2023, Tugushev became CTO of Xsolla Labs.  (*Id.* ¶ 37.)  Tugushev is a Russian citizen and permanent resident residing in Portugal.  (Decl. Albert Tugushev ISO Tugushev Mot. ("Tugushev Decl.") ¶¶ 3–5, ECF No. 60-1.)  He worked for Xsolla while in Montenegro and Malaysia.  (*Id.* ¶ 29.)

Most Xsolla employees sign confidentiality agreements, and all employees sign Xsolla's employee handbook.  (SAC ¶ 28.)  Each of Aghanim's Founders signed Xsolla documents with confidentiality clauses.  (*Id.* ¶¶ 31, 36, 39.)  In 2020,

Golubitsky signed an Xsolla employment agreement with a confidentiality clause upon his promotion to CTO. (*Id.* ¶¶ 31–32.) In 2022, Golubitsky and Andry both signed an Xsolla employee handbook, which warns that employees who improperly disclose confidential information "may be subject to disciplinary action, up to and including termination of employment." (*Id.* ¶¶ 33, 36.) When Tugushev started at Xsolla, he signed an agreement stating that neither Xsolla nor Tugushev "shall disclose any confidential information of the other" and that both parties "acknowledge entering into a separate nondisclosure agreement relating to the confidential information." (*Id.* ¶ 39.) Tugushev signed three contracts with Xsolla: an Independent Contract Agreement effective March 1, 2023; a Mutual Confidentiality Agreement effective March 1, 2023; and an Independent Contractor Agreement effective May 1, 2023. (Tugushev Decl. ¶¶ 18, 21, 24, Ex. A ("March ICA"), Ex. B ("MCA"), Ex. C ("May ICA," and collectively, with the March ICA, the "ICAs"), ECF Nos. 60-2 to 60-4.)

While at Xsolla, Aghanim's Founders had access to Xsolla's most sensitive customer, product, pricing, and technical information. (SAC ¶¶ 30, 35, 42.) From October 2022 through April 2024, Aghanim's Founders downloaded, copied, and/or forwarded Xsolla's internal and highly sensitive documents for themselves. (*Id.* ¶ 46.) Aghanim's Founders used these trade secrets and confidential information to establish Aghanim, a Xsolla competitor, with its principal place of business in Los Angeles, California. (*Id.* ¶ 11.). Aghanim used Xsolla's confidential information to rapidly develop its video game service and payment platform, which includes offerings identical to Xsolla's. (*Id.* ¶¶ 57, 70–72, 75.) Per Xsolla, Aghanim could not have developed its offerings so quickly without using Xsolla's trade secrets and confidential information. (*Id.* ¶¶ 74, 76, 80.) Aghanim also targeted Xsolla's customers by stealing its customer-specific pricing information and using it to undercut Xsolla's pricing and interfere with customer relationships. (*Id.* ¶¶ 63, 77.)

Just a few months after Aghanim's Founders left Xsolla, Aghanim began soliciting investors and advertising itself as the "new Xsolla." (*Id.* ¶ 56.) Aghanim included Xsolla's name in its materials and advertised similar technology and services as Xsolla, leading Xsolla's customers to question whether the companies were affiliated. (*Id.* ¶¶ 62, 164.) Some Xsolla customers inquired into the relationship between the companies, resulting in awkward conversations about Aghanim and its founders and significant efforts on Xsolla's part to address customer confusion. (*Id.* ¶ 62.) Aghanim also meta-tagged its website with "Xsolla" so that its site would appear in search results related to Xsolla. (*Id.* ¶¶ 78, 163.)

From 2023 to 2024, Aghanim also spread disparaging rumors about Xsolla and misrepresented its own capabilities to make its services seem better than Xsolla's. (*Id.* ¶ 83.) On one occasion, Aghanim poached one of Xsolla's customers by falsely saying that Xsolla was unable to address the customer's needs. (*Id.* ¶ 84.) On another, Aghanim misrepresented Xsolla's pricing to a prospective Xsolla customer, causing the customer to contract with Aghanim instead. (*Id.* ¶ 85.)

## B.   Procedural Background

On March 14, 2024, Xsolla filed a complaint against Aghanim. (Compl., ECF No. 1.) On April 19, 2024, Xsolla filed its FAC, adding Tugushev as a defendant. (First Am. Complaint ("FAC") ¶ 12, ECF No. 25.) In the FAC, Xsolla alleged (1) violation of the Defend Trade Secrets Act ("DTSA"), 18 U.S.C § 1836, *et seq.*, (2) violation of the California Uniform Trade Secrets Act ("CUTSA"), California Civil Code section 3426, (3) intentional interference with prospective economic advantage, (4) negligent interference with prospective economic advantage, (5) intentional interference with contract, (6) violation of California's Unfair Competition Law ("UCL"), California Business and Professional Code section 17200, *et seq.*, (7) federal trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114, and (8) breach of contract. (FAC ¶¶ 66–138.)

On September 10, 2024, the Court granted in part and denied in part Aghanim's motion to dismiss.  (Order Mot. Dismiss ("First Order"), ECF No. 52.)  As to the trade secret claims, the Court held that Xsolla alleged it owned a trade secret, but dismissed those claims for failure to adequately allege Aghanim misappropriated those trade secrets.  (*Id.* at 7–19.)  As to the interference claims, the Court ruled that CUTSA preempted them.  (*Id.* at 19–20.)  As to the UCL claim, the Court held that CUTSA preempted part of that claim and Xsolla did not establish it had pleaded an injury-in-fact regarding the remainder.  (*Id.* at 21–23.)  Finally, the Court found that Xsolla adequately alleged trademark violation.  (*Id.* at 23–25.) All dismissals were with leave to amend.  (*Id.* at 26.)

In the SAC, Xsolla realleges all but the negligent interference of contract claim. (SAC ¶¶ 87–176.)  Thus, Xsolla brings the following claims against both Aghanim and Tugushev:  (1) violation of DTSA; (2) violation of CUTSA; (3) intentional interference with prospective economic advantage; (4) intentional interference with contract; and (5) violation of the UCL.  Xsolla also claims (6) Aghanim infringed its trademark and (7) Tugushev breached his contract with Xsolla.

Tugushev now moves to dismiss the claims against him under Federal Rules of Civil Procedures ("Rule" or "Rules") 12(b)(2) (personal jurisdiction), 12(b)(3) (venue), 12(b)(6) (failure to state a claim), and for *forum non conveniens*.  (Tugushev Mot.)  Aghanim separately moves to dismiss under Rule 12(b)(6) for failure to state a claim and to strike certain allegations under Rule 12(f), a motion Tugushev joins. (Aghanim Mot.; Joinder, ECF No. 59.)  These motions are fully briefed.  (Opp'n Tugushev Mot., ECF No. 65; Tugushev Reply, ECF No. 67; Opp'n Aghanim Mot., ECF No. 62; Aghanim Reply, ECF No. 64.)

## IV.   LEGAL STANDARD

### A.   Rule 12(b)(2)—Personal Jurisdiction

Federal courts have the power to exercise personal jurisdiction to the extent permitted by the laws of the states in which they sit.  Fed. R. Civ. P. 4(k)(1)(A).

"California's long-arm jurisdictional statute is coextensive with federal due process requirements . . . ." *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800–01 (9th Cir. 2004); *see* Cal. Civ. Proc. Code § 410.10. Therefore, the court inquires whether the defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Glencore Grain Rotterdam B.V. v. Shivnath Rai Harnarain Co.*, 284 F.3d 1114, 1123 (9th Cir. 2002) (alteration in original) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

When a defendant seeks dismissal under Rule 12(b)(2), the plaintiff bears the burden of demonstrating that personal jurisdiction is proper. *Menken v. Emm*, 503 F.3d 1050, 1056 (9th Cir. 2007). Where, as here, a motion to dismiss for lack of personal jurisdiction is based on written materials rather than an evidentiary hearing, "the plaintiff need only make a prima facie showing of jurisdictional facts." *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir. 1990). However, the plaintiff cannot "simply rest on the bare allegations of its complaint." *Schwarzenegger*, 374 F.3d at 800. The court "may not assume the truth of allegations in a pleading which are contradicted by affidavit, but factual conflicts between dueling affidavits must be resolved in the plaintiff's favor." *Ayla, LLC v. Alya Skin Pty. Ltd.*, 11 F.4th 972, 978 (9th Cir. 2021) (internal citation and quotation marks omitted). "[M]ere 'bare bones' assertions of minimum contacts with the forum or legal conclusions unsupported by specific factual allegations will not satisfy a plaintiff's pleading burden." *Swartz v. KPMG LLP*, 476 F.3d 756, 766 (9th Cir. 2007). Nor will "random," "fortuitous," or "attenuated" contacts establish specific personal jurisdiction. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985).

**B.    Rule 12(b)(3)—Venue**

A party may move to dismiss a case for improper venue under Rule 12(b)(3). If venue is improper, the district court "shall dismiss, or if it be in the interest of justice, transfer such case to any district or division in which it could have been brought."

28 U.S.C. § 1406(a).  Dismissal for improper venue must be without prejudice.  *See In re Hall, Bayoutree Assocs., Ltd.*, 939 F.2d 802, 804 (9th Cir. 1991)

"Whether venue is 'wrong' or 'improper' depends exclusively on whether the court in which the case was brought satisfies the requirements of federal venue laws." *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 55 (2013). On a venue challenge, the plaintiff bears the burden of showing venue is proper. *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979). "Courts may consider facts outside the pleadings and need not accept the pleadings as true, but all reasonable inferences and factual conflicts must be resolved in the nonmoving party's favor."  *Kantharia v. USCIS*, 672 F. Supp. 3d 1030, 1032 (C.D. Cal. 2023).

**C.    *Forum Non Conveniens***

"[T]he appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*."  *Atl. Marine*, 571 U.S. at 60.  Under the doctrine of *forum non conveniens*, a district court may dismiss a civil action when "the convenience of parties and witnesses" and "the interest of justice" support moving the case outside the federal court system, to a state or foreign forum.  *Id.* at 62–63.

In the typical case *not* involving a forum-selection clause, a district court considering a *forum non conveniens* motion must evaluate both the private interests of the parties, such as convenience and costs, and "various public-interest considerations."  *Id.* at 62.  "The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which represents the parties' agreement as to the most proper forum."  *Id.* at 63 (internal quotation marks omitted). In such circumstances "a valid forum-selection clause should be given controlling weight in all but the most exceptional cases."  *Id.* (cleaned up).

## D.     Rule 12(b)(6)—Failure to State a Claim

A court may dismiss a complaint under Rule 12(b)(6) for lack of a cognizable legal theory or insufficient facts pleaded to support an otherwise cognizable legal theory. *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1988). To survive a dismissal motion, a complaint need only satisfy the minimal notice pleading requirements of Rule 8(a)(2)—a short and plain statement of the claim. *Porter v. Jones*, 319 F.3d 483, 494 (9th Cir. 2003). The factual "allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). That is, the "complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

The determination of whether a complaint satisfies the plausibility standard is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. A court is generally limited to the pleadings and must construe all "factual allegations set forth in the complaint . . . as true and . . . in the light most favorable" to the plaintiff. *Lee v. City of Los Angeles*, 250 F.3d 668, 679 (9th Cir. 2001). However, a court need not blindly accept conclusory allegations, unwarranted deductions of fact, and unreasonable inferences. *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001).

Where a district court grants a motion to dismiss, it should generally provide leave to amend unless it is clear the complaint could not be saved by any amendment. *See* Fed. R. Civ. P. 15(a); *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986). Thus, leave to amend "is properly denied . . . if amendment would be futile." *Carrico v. City & County of San Francisco*, 656 F.3d 1002, 1008 (9th Cir. 2011).

**E.    Rule 12(f)—Motion to Strike**

Under Rule 12(f), the court "may strike from a pleading . . . any redundant, immaterial, impertinent, or scandalous matter."  The decision on whether to grant a motion to strike is at the court's discretion.  *See Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1528 (9th Cir. 1993), *rev'd on other grounds*, 510 U.S. 517 (1994).  The court must view the pleadings in the light most favorable to the non-moving party.  *U.S. ex rel. Ruhe v. Masimo Corp.*, 929 F. Supp. 2d 1033, 1038 (C.D. Cal. 2012).

Courts may grant a motion to strike "to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial."  *Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 973 (9th Cir. 2010).  Courts may also grant a motion to strike to streamline the resolution of the action and focus the fact finder's attention on the real issues in the case.  *See Fantasy*, 984 F.2d at 1528.  Motions to strike are generally disfavored and should not be granted "unless it is clear that the matter to be stricken could have no possible bearing on the subject matter of litigation."  *Shabaz v. Polo Ralph Lauren Corp.*, 586 F. Supp. 2d 1205, 1209 (C.D. Cal. 2008).  "Given their disfavored status, courts often require a showing of prejudice by the moving party before granting the requested relief."  *Cal. Dep't of Toxic Substances Control v. Alco Pac., Inc.*, 217 F. Supp. 2d 1028, 1033 (C.D. Cal. 2002) (internal quotation marks omitted).

## V.    TUGUSHEV'S MOTION TO DISMISS

Tugushev and Aghanim each filed motions to dismiss.  (Tugushev Mot.; Aghanim Mot.)  Tugushev also joins Aghanim's Motion.  (Joinder.)  The Court first addresses Tugushev's Motion.  It then addresses Aghanim's Motion for dismissal before turning to Aghanim's request to strike certain allegations.

In his Motion, Tugushev moves to dismiss the SAC under Rules 12(b)(2), (3), (6), and for *form non conveniens*.  (Tugushev Mot.)

**A.    Forum Non Conveniens**

Tugushev first moves to dismiss the SAC for *forum non conveniens*, arguing that Xsolla can only bring this case against him in Russia based on the forum-selection clause in the ICAs.  (*Id.* at 5–7.)  Under this doctrine, a district court may dismiss a civil action when "the convenience of parties and witnesses" and "the interest of justice" support moving the case outside the federal court system to a state or foreign forum.  *Atl. Marine*, 571 U.S. at 62–63.

Typically, "a defendant bears the burden of demonstrating an adequate alternative forum, and that the balance of private and public interest factors favors dismissal."  *Lewis v. Liberty Mut. Ins. Co.*, 953 F.3d 1160, 1165 (9th Cir. 2020).  However, "[w]hen parties agree to a forum-selection clause," courts "must deem the private-interest factors to weigh entirely in favor of the preselected forum."  *Atl. Marine*, 571 U.S. at 64.  The burden also shifts to the plaintiff to show that the case should not be heard in the agreed forum.  *Id.*  While "the Supreme Court did not address the distinction between permissive and mandatory forum selection clauses," "[d]istrict courts across the country have . . . . declined to apply *Atlantic Marine*" if the forum-selection clause is permissive.[3]  *Knight v. Wata, Inc.*, No. 8:22-cv-00967-DOC (KESx), 2022 WL 3574441, at *2 (C.D. Cal. July 27, 2022) (first alteration in original).  Therefore, the Court begins with the parties' forum-selection clause.

The March ICA and May ICA have identical forum-selection clauses that state:

14.6 <u>Governing Law</u>. The validity and effect of this Agreement shall be governed by and construed and enforced in accordance with the laws of the Russian Federation without reference to conflicts of laws principles. In the event of any dispute between the Parties arising from or relating to this Agreement, a Party may send the other Party written notice identifying the matter in dispute. The Parties shall thereafter consult and negotiate with each other in good faith and, recognizing their mutual interests, attempt to reach a just and equitable solution of the dispute

---

[3] Neither party asserts that the *Atlantic Marine* factors should apply if the Court finds the parties' forum-selection clause to be permissive.  (*See* Tugushev Mot. 5–7; Opp'n Tugushev Mot. 10–15; Tugushev Reply 3–5.)

satisfactory to both Parties. In the event that, within 30 days following the initial written notice described above, the Parties have not resolved the dispute, either Party may submit the dispute to be resolved by the state court in the Russian Federation pursuant to the effective laws of the Russian Federation.

(ICAs § 14.6.)

The parties dispute whether the forum-selection clause is mandatory. (*See* Tugushev Mot. 5–7; Opp'n Tugushev Mot. 10–15; Tugushev Reply 3–5.) When interpreting a forum-selection clause, courts first consider the "plain language of the contract." *Simonoff v. Expedia, Inc.*, 643 F.3d 1202, 1205 (9th Cir. 2011). Courts interpret this language "with the understanding that the common or normal meaning of language will be given to the words of a contract unless circumstances show that in a particular case a special meaning should be attached to it." *Id.* (internal quotation marks omitted). "The prevailing rule is . . . that where venue is specified with mandatory language the clause will be enforced." *Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 99 F. Supp. 3d 1110, 1162 (C.D. Cal. 2015) (alteration in original) (quoting *Docksider, Ltd. v. Sea Tech.*, 875 F.2d 762, 764 (9th Cir. 1989)). "To be mandatory, a clause must contain language that clearly designates a forum as the exclusive one." *Id.* (quoting *N. Cal. Dist. Council of Laborers v. Pittsburg-Des Moines Steel Co.*, 69 F.3d 1034, 1037 (9th Cir. 1995)).

Xsolla highlights the word "may," arguing that the ICAs unambiguously state that "either Party *may* submit the dispute to be resolved" in Russian state court, meaning the parties have the option to sue elsewhere. (Opp'n Tugushev Mot. 11 (quoting ICAs § 14.6).) Conversely, Tugushev focuses on the words "shall" and "any dispute." (Tugushev Reply 3 (quoting ICAs § 14.6).) He argues that, because the clause "begins with the word 'shall' and sets forth a process that applies to 'any dispute,'" this process is mandatory. (*Id.* (quoting ICAs § 14.6).) He challenges Xsolla's argument, that "may" means the clause is permissive, by asserting that, read in context, "'may' pertains not to *where* a party may bring a claim but to *whether* a

party decides to do so." (*Id.*)  In other words, "if a party decides to pursue its claims in court, it must do so in" Russia.  (*Id.*)

The Court agrees with Xsolla's reading.  The ICAs set forth a permissive process that the parties may utilize "[i]n the event of any dispute."  (ICAs § 14.6.)  Through this process, a party "*may*," but need not, "send the other Party written notice identifying the matter in dispute."  (*Id.*)  Once a party sends written notice, a mandatory part of the process is triggered: the parties "*shall*" negotiate in good faith.  (*Id.*)  Then, if the parties have not resolved the dispute, either party "*may*" sue in Russian state court.  (*Id.*)

Tugushev's emphasis of the word "shall" does not support his conclusion.  The first use of the word relates to the laws that govern the ICAs, not venue.  (*See* ICAs § 14.6 ("The validity and effect of this Agreement shall be governed by and construed and enforced in accordance with the laws of the Russian Federation . . . .").)  The second use of "shall" provides a mechanism for a party to require a counterparty to get to the negotiating table.  If the negotiations fail, then the parties have submitted to the non-exclusive jurisdiction of Russian courts to resolve a dispute.  The fact that the parties used the word "shall" twice in this section, but opted for the word "may" when discussing jurisdiction, further supports that the parties knew to use the word "shall" to indicate mandatory language.

In a declaration submitted on behalf of Tugushev, Dmitry Kunitsa, a Russian lawyer, declares that the Russian word for "may" in Section 14.6 "should be interpreted to mean 'has the right (but not an obligation) to sue' but not as 'also has a right to sue in other courts.'"  (Decl. Dmitry Kunitsa ISO Tugushev Reply ("Kunitsa Decl.") ¶ 32, ECF No. 67-1.)  While the ICAs' Russian text controls, (ICAs § 14.8), Kunitsa's Declaration does not alter this Court's conclusion.  Kunitsa's basis for his interpretation of the word "may" is that, "as a matter of Russian law," the parties could choose "to provide in the May ICA that the dispute should be resolved in a foreign court of law or to allow the plaintiff to decide in which country to bring the

claim." (Kunitsa Decl. ¶ 32.)  He concludes that the parties "did not exercise this choice." (*Id.*)  This issue is not whether, under Russian law, the parties could contract mandatary venue for a lawsuit, but whether they chose to do so.  Kunitsa's interpretation that the parties did not exercise this right is conclusory and circular: he essentially argues that because the parties "did not exercise this choice," the Russian word for "may" means that the clause is mandatory.  (*See id.*)  Therefore, the Court is not persuaded by Kunista's Declaration.

For the foregoing reasons, the Court finds that the ICAs' forum-selection clause is not mandatory.  Thus, on his motion to dismiss for *forum non conveniens*, Tugushev "bears the burden of demonstrating an adequate alternative forum, and that the balance of private and public interest factors favors dismissal."  *Lewis*, 953 F.3d at 1165.  The balance of these factors must "strongly favor trial in the foreign county." *Dole Food Co. v. Watts*, 303 F.3d 1104, 1118 (9th Cir. 2002).

Tugushev does not argue that the private factors favor dismissal.  (*See* Tugushev Mot. 5–7; Tugushev Reply 3–5.)  Regarding the public interest factors, courts consider "(1) the local interest in the lawsuit, (2) the court's familiarity with the governing law, (3) the burden on local courts and juries, (4) congestion in the court, and (5) the costs of resolving a dispute unrelated to a particular forum."  *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1232 (9th Cir. 2011).  As discussed in detail below, the Court finds the ICAs' choice of law provision unenforceable in California, meaning this Court is familiar with the law governing this action.  Further, California has an interest in a dispute between a California company and a former worker concerning the worker's alleged misappropriation of trade secrets to start a competitor.  At best, Tugushev could demonstrate that the remaining public interest factors are neutral.  (*See* Tugushev Mot. 7.)  This is far from meeting his burden to show the private and public factors "strongly favor" trial in Russia.  *See Dole*, 303 F.3d at 1118.  Thus, the Court **DENIES** Tugushev's Motion to the extent he seeks dismissal for *forum non conveniens*.

**B.      Personal Jurisdiction**

Next, Tugushev moves to dismiss this case as against him for lack of personal jurisdiction under Rule 12(b)(2).  (Tugushev Mot. 7–14.)  Xsolla does not seriously contend that this Court has general personal jurisdiction over Tugushev.  (*See* Opp'n Tugushev Mot. 15–22.).  Instead, the parties dispute whether the Court has specific personal jurisdiction over Tugushev.  (*See* Tugushev Mot. 9–14; Opp'n Tugushev Mot. 15–22; Tugushev Reply 8–10.)

The Ninth Circuit has formulated three requirements for establishing specific jurisdiction over a non-resident defendant:

> (1) the defendant must either purposefully direct his activities toward the forum or purposefully avail himself of the privileges of conducting activities in the forum; (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Axiom Foods, Inc. v. Acerchem Int'l, Inc.*, 874 F.3d 1064, 1068 (9th Cir. 2017) (cleaned up).  While "[t]he plaintiff bears the burden on the first two prongs," once these prongs are shown, "the defendant must come forward with a 'compelling case' that the exercise of jurisdiction would not be reasonable." *Ayla*, 11 F.4th at 979.

1.      *Purposeful Direction and Purposeful Availment*

Under the first prong, "to be subject to specific jurisdiction the defendant must purposefully direct its activities toward the forum state, purposefully avail itself of the privileges of conducting activities there, or engage in some combination thereof." *Impossible Foods Inc. v. Impossible X LLC*, 80 F.4th 1079, 1088 (9th Cir. 2023) (internal quotation marks omitted).  Whether a court evaluates "a defendant's contacts under the purposeful direction or purposeful availment test turns on the nature of the underlying claims." *Id.* (internal quotation marks omitted).  Courts generally apply the purposeful availment test "in suits sounding in contract and for unintentional tort claims." *Herbal Brands, Inc. v. Photoplaza, Inc.*, 72 F.4th 1085, 1090 (9th Cir. 2023)

(internal citations omitted).  Conversely, courts apply the purposeful direction test to intentional torts.  *Id.*

Here, Xsolla brings both contract and "tort-like," *id.* at 1091, claims against Tugushev.  (SAC ¶¶ 87–159, 173–76.)  Rather than discuss which test applies, the parties brief both tests.  (*See* Tugushev Mot. 9–12; Opp'n Tugushev Mot. 16–20.) This Court joins other courts that have applied the purposeful direction test where a plaintiff brings both contract and tort-like claims.  *See, e.g.*, *Vanguard Logistics Servs. USA, Inc. v. Robinson*, No. 2:20-cv-09880-JAK (PVCx), 2023 WL 9003010, at *1, 6 (C.D. Cal. Feb. 28, 2023) (applying purposeful direction test where causes of action included breach of contract and trade secret misappropriation).  Additionally, "a court may assert pendent personal jurisdiction over a defendant with respect to" claims that "arise[] out of a common nucleus of operative facts with a claim in the same suit over which the court does have personal jurisdiction."  *Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1180 (9th Cir. 2004).  Therefore, if the purposeful direction test supports personal jurisdiction over Xsolla's tort claims, then the Court could assert pendent personal jurisdiction over Xsolla's contract claim, regardless of whether the purposeful availment test supports personal jurisdiction over that claim. *See, e.g.*, *Vanguard Logistics*, 2023 WL 9003010, at *6 n.1 (holding the same as to misappropriation and contract claims); *Enertrode, Inc. v. Gen. Capacitor Co.*, No. 16-cv-02458-HSG, 2016 WL 7475611, at *3, (N.D. Cal. Dec. 29, 2016) (same).

To determine whether a defendant "purposefully directed" its activities toward the forum, courts apply the "effects" test derived from *Calder v. Jones*, 465 U.S. 783 (1984).  *Herbal Brands*, 72 F.4th at 1091.  That "test asks whether the defendant: (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  *Id.* (internal quotation marks omitted).

a.  Intentional Act

Xsolla alleges that Tugushev committed intentional acts by "improperly acquir[ing], us[ing] and disclos[ing] Xsolla's trade secrets to Aghanim" through using "his broad access rights to download, copy, or otherwise improperly take Xsolla's trade secrets."  (SAC ¶ 124.)  Also, Tugushev, Andry, and Golubitsky "collectively planned" to steal Xsolla's trade secret information "to start up a competing company" and used this information "for the purpose of . . . soliciting and poaching Xsolla's customers."  (*Id.* ¶¶ 43, 45, 124.)  Therefore, Xsolla alleges intentional acts.

b.  Expressly Aimed

Through this prong, courts analyze "whether the defendant's allegedly tortious action was 'expressly aimed at the forum.'"  *Picot v. Weston*, 780 F.3d 1206, 1214 (9th Cir. 2015).  This requires "[s]omething more" "than the defendant's awareness that the plaintiff it is alleged to have harmed resides in or has strong ties to the forum."  *Ayla*, 11 F.4th at 980.

Xsolla does not allege that Tugushev downloaded its trade secrets from California.  (*See generally* SAC.)  Nor does it allege that he used the trade secrets to poach its California customers.[4]  Nevertheless, Xsolla alleges "something more" than it being a California company.  Xsolla alleges that Tugushev's intentional acts— stealing trade secrets and poaching customers—were part of a scheme to "develop[]" and "set[] up" Aghanim, "a competing independent video game payment and services platform business."  (SAC ¶¶ 124, 130; *see also id.* ¶ 12 (alleging that Tugushev is one of Aghanim's co-founders).)  Aghanim has its principal place of business in California.  (*Id.* ¶¶ 11.)  Thus, Tugushev expressly aimed his conduct at California through this scheme.  That Tugushev is not a California resident "does not somehow

---

[4] In a declaration accompanying its Opposition to Tugushev's Motion, Xsolla's Chief Investment Officer declares facts that support such an allegation.  (*See* Decl. Dmitry Burkovskiy ISO Opp'n Tugushev Mot. ("Burkovskiy Decl.") ¶¶ 6–8, ECF No. 65-1.)  The Court does not consider these facts because they were not alleged in the complaint, (*see* SAC), and Xsolla has established personal jurisdiction even without these allegations.

insulate" him from jurisdiction. *Calder*, 465 U.S. at 790 (holding that jurisdiction is proper because plaintiffs are "primary participants in an alleged wrongdoing intentionally directed at a California resident"); *cf. Burger King*, 471 U.S. at 479 n.22 ("[W]hen commercial activities are carried on in behalf of an out-of-state party, those activities may sometimes be ascribed to the party, at least where he is a primary participant in the enterprise and has acted purposefully in directing those activities" (cleaned up)).  Therefore, Xsolla has sufficiently alleged Tugushev's intentional acts were expressly aimed at California.

### c. Harm Suffered in California

Under the third prong, Tugushev must have caused harm that he knows was likely to be suffered in California. *Herbal Brands*, 72 F.4th at 1091.  Xsolla is a California corporation, (SAC ¶ 10) and Tugushev knew this, (ICAs 1 ("Xsolla . . . [is] a California corporation, with its principal business located at . . . California . . . .)). *See CollegeSource, Inc. v. AcademyOne, Inc.*, 653 F.3d 1066, 1079 (9th Cir. 2011) (holding that "a corporation incurs economic loss, for jurisdictional purposes, in the forum of its principal place of business.").  Thus, Xsolla sufficiently alleges that Tugushev caused harm that he knew was likely to be suffered in California.

Tugushev argues that Xsolla's status as a "California corporation cannot anchor [his] California contacts because plaintiff cannot be the only link between the defendant and the forum." (Tugushev Mot. 11 (internal quotation marks omitted).)  In *Walden v. Fiore*, the Supreme Court held that a "plaintiff cannot be the only link between the defendant and the forum." 571 U.S. 277, 285 (2014).  Instead, "it is the defendant's conduct that must form the necessary connection with the forum State that is the basis for its jurisdiction over him." *Id.*  However, *Walden* does not preclude a plaintiff from relying on its status as a California corporation to support the third prong.  After all, the Supreme Court held that "a defendant's relationship with a plaintiff or third party, *standing alone*, is an insufficient basis for jurisdiction." *Id.* at 286 (emphasis added).  Here, neither of the first two prongs rely on Xsolla's status

as a California corporation; they stem from Tugushev misappropriating trade secrets and soliciting customers to set up a competing California-based company.  Since *Walden*, courts in this district considering similar allegations have found the third prong met based on the plaintiff's status.  *See, e.g.*, *All-Tex, Inc. v. Aramsco, Inc.*, No. 2:18-cv-00410-DSF (Ex), 2018 WL 11474076, at *3 (C.D. Cal. July 5, 2018) (finding third prong met where defendant "allegedly misappropriated the trade secrets from a California corporation and provided them to his current employer," a competitor); *Pray, Inc. v. Christian Care Ministry, Inc.*, No. 2:23-cv-10660-SB (JCx), 2024 WL 3509781, at *5 (C.D. Cal. June 7, 2024) (holding that *Walden* and its progeny did not overrule *CollegeSource*, as "its effect on the individualized targeting theory goes to the second prong of purposeful direction, not the third").

Viewing the facts in light most favorable to Xsolla, *Schwarzenegger*, 374 F.3d at 800, the Court finds that Tugushev purposefully directed his activities toward California.

### 2.    *Forum-Related Activities*

The Court next turns to whether Xsolla's claims against Tugushev "arise[] out of or relate to" his "contacts with" California.  *Axiom Foods*, 874 F.3d at 1068.  At the very least, Xsolla's trade secret misappropriation, (SAC ¶¶ 87–132), and breach of contract, (*id.* ¶¶ 173–76), claims arise out of and relate to Tugushev's scheme to found and assist a competing California-based company by stealing another California company's trade secrets.  Therefore, Xsolla's claims arise out of and relate to Tugushev's contacts with California.

### 3.    *Reasonableness*

"If the plaintiff succeeds in satisfying both of the first two prongs," as Xsolla has here, "the burden then shifts to the defendant to 'present a compelling case' that the exercise of jurisdiction would not be reasonable." *Schwarzenegger*, 374 F.3d at 802.  In this analysis, courts weigh the following factors:

> (1) the extent of the defendant's purposeful interjection into the forum state's affairs; (2) the burden on the defendant of defending in the forum; (3) the extent of conflict with the sovereignty of the defendant's state; (4) the forum state's interest in adjudicating the dispute; (5) the most efficient judicial resolution of the controversy; (6) the importance of the forum to the plaintiff's interest in convenient and effective relief; and (7) the existence of an alternative forum.

*Impossible Foods*, 80 F.4th at 1099.

### a. Extent of Purposeful Injection into California's Affairs

This factor "is analogous to the purposeful direction" test. *Id.* (internal quotation marks omitted). The Court has determined that Tugushev purposefully directed his activities towards California, so this factor weighs in favor of jurisdiction. *See, e.g.*, *Doe v. WebGroup Czech Republic, a.s.*, 93 F.4th 442, 458 (9th Cir. 2024) (finding this factor favors jurisdiction where purposeful direction test is met).

### b. Burden on Tugushev in Defending in California

The Court next considers Tugushev's burden in defending against this suit in California. This burden is undoubtedly high. He has never visited the United States and needs a visa to enter the country. (Tugushev Decl. ¶¶ 6, 11.) While the United States issued him a visa in 2018 (which he did not use), it denied his two most recent visa applications in 2023. (*Id.* ¶¶ 11–12.) However, "[w]hen minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even the serious burdens placed on the alien defendant." *Ayla*, 11 F.4th at 984 (quoting *Asahi Metal Indus. Co. v. Superior Ct.*, 480 U.S. 102, 114 (1987)). Therefore, Tugushev's burden to "have to travel to the United States for court appearances is entitled to little weight." *WebGroup*, 93 F.4th at 458.

### c. Conflict with Sovereignty of Tugushev's State

As to the third factor, the Court considers the conflict with the sovereignty of the defendant's state. Tugushev argues that "when, as here, 'defendant is from a foreign nation . . . , the sovereignty barrier is high and undermines the reasonableness of personal jurisdiction.'" (Tugushev Mot. 13 (alteration in original) (quoting

*Glencore Grain*, 284 F.3d at 1126).)  But Tugushev does not even identify the state whose sovereignty is threatened.  Is it Russia, where he is a citizen?  (*See* Tugushev Decl. ¶ 3.)  Is it Portugal, where Tugushev resides?  (*See id.* ¶ 5.)  Or is it Montenegro, where he executed the MCA and ICAs?  (*See id.* ¶¶ 20, 23, 26.)  Nor does Tugushev explain how this Court's exercise of jurisdiction would impinge upon the sovereignty of a foreign country when the dispute arises from Tugushev's alleged acts done to support an American company to compete with and harm another American company.

In any event, this factor "is not controlling."  *Harris Rutsky & Co. Ins. Servs. v. Bell & Clements Ltd*, 328 F.3d 1122, 1133 (9th Cir. 2003); *see Gates Learjet Corp. v. Jensen*, 743 F.2d 1325, 1333 (9th Cir.1984) ("If [this factor were] given controlling weight, it would always prevent suit against a foreign national in a United States court.").  At most, this factor weighs slightly in Tugushev's favor.

### d. California's Interest in Adjudicating the Dispute

Next, the Court evaluates California's interest in adjudicating the dispute between Xsolla and Tugushev.  Tugushev argues that "California's interest, if any, is not significant because the ICAs designate Russian courts as the appropriate forum, and parallel claims against the other Aghanim founders are before the AAA."  (Tugushev Mot. 13–14.)  The Court disagrees.  First, the Court already held that the forum-selection clause is permissive, so Russian courts are *an* appropriate forum, not *the* appropriate forum.  Second, while the claims against the other Aghanim Founders are in arbitration, the claims against Aghanim itself is in this Court.  Finally, and most importantly, "California maintains a strong interest in providing an effective means of redress for its residents," like Xsolla, that are injured.  *Harris Rutsky*, 328 F.3d at 1133.  Accordingly, this factor weighs in favor of this Court's jurisdiction.

### e. Most Efficient Judicial Resolution

As to the fifth factor, the Court considers which forum could most efficiently resolve this controversy.  Tugushev notes that the parties' selection of Russia as a forum supports Russia as the most efficient one.  (Tugushev Mot. 14.)  Once again,

the parties designated Russia as *a* forum, not *the only* forum.  Two key considerations favor California as the most efficient.  First, Tugushev has not identified any evidence or potential witnesses that are in Russia.  (*See id.*); *Harris Rutsky*, 328 F.3d at 1133 (considering "the location of the evidence and witnesses").  Meanwhile, Xsolla, Aghanim, and the two other Aghanim Founders were or are all in California.  Second, it would be more efficient to try Xsolla's claims against Aghanim and Tugushev in the same forum.  Accordingly, this factor weighs in favor of this Court's jurisdiction.

### f.  Importance of California to Xsolla's Convenient and Effective Relief

The parties dispute whether Russia can provide effective relief to Xsolla.  (*See* Mot. Tugushev 14; Opp'n Tugushev Mot. 21.)  It appears that Russian courts may not have jurisdiction over Aghanim. (*See* Opp'n Tugushev Mot. 12–13; *cf.* Mot. Tugushev 4–5.)  If this Court has no jurisdiction over Tugushev, then Xsolla may need "to litigate separate suits in at least two different countries."  *Dole*, 303 F.3d at 1116.  Though, "in this circuit, the plaintiff's convenience is not of paramount importance."  *Id.*  Thus, this factor weighs slightly in favor of jurisdiction.

### g.  Existence of an Alternative Forum

This final factor "is relevant only when, under the other factors, a U.S. forum is shown to be unreasonable."  *WebGroup*, 93 F.4th at 458 (internal quotation marks omitted).  Of the first six factors, only two—burden on defendant and sovereignty conflicts—favor Tugushev.  Both are entitled to little weight.  *Dole*, 303 F.3d at 1117 ("By their very nature, these two factors are likely to favor foreign defendants every time personal jurisdiction in the United States is considered.").  Thus, Tugushev has not made a showing that California is unreasonable, so the Court need not consider whether an alternative forum is available.  In any event, Tugushev has not identified a forum where Xsolla can proceed against both Tugushev and Aghanim.  (*See* Tugushev Mot.); *Dole*, 303 F.3d at 1116–17 (indicating that this factor weighs against dismissal when there is not an "alternative forum that has subject matter and personal jurisdiction over all parties and issues").

Taking the factors together, the Court concludes that Tugushev has failed to make a compelling showing that this Court's exercise of personal jurisdiction over him would be unreasonable.  Accordingly, the Court **DENIES** Tugushev's motion to dismiss under Rule 12(b)(2) for lack of personal jurisdiction.

## C.    Venue

Tugushev also moves to dismiss Xsolla's claims against him for improper venue.  (Mot. Tugushev 14–15.)  Under 28 U.S.C. § 1391(b), when all defendants do not reside in the same state, venue is proper in

> (2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
>
> (3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

As discussed, this Court has personal jurisdiction over Tugushev.  It also has personal jurisdiction over Aghanim.  (*See* SAC ¶ 11 (alleging Aghanim's principal place of business is in this district).)  Accordingly, even if venue is not proper based on § 1391(b)(2), it is proper because Tugushev and Aghanim are subject to this Court's personal jurisdiction under § 1391(b)(3) and there does not appear to be another district in which venue would be proper.  Accordingly, the Court **DENIES** Tugushev's motion to dismiss under Rule 12(b)(3) for improper venue.

## D.    Failure to State a Claim

Lastly, Tugushev moves to dismiss Xsolla's claims against him under Rule 12(b)(6).[5]  He asserts two independent bases for dismissal.  First, he argues that the ICAs' choice of law provisions bar claims under United States and California law.  (Tugushev Mot. 15–18.)  Second, he argues that Xsolla's statutory and California common law claims must be dismissed because they have no extraterritorial application.  (*Id.* at 19–21.)

---

[5] The Court addresses below the arguments that Aghanim raises in which Tugushev joins.  (Joinder.)

1.    *Choice of Law*

The ICAs state, "The validity and effect of this Agreement shall be governed by and construed and enforced in accordance with the laws of the Russian Federation." (ICAs § 14.6.)   Separately, the MCA "will be governed by and construed in accordance with the effective laws of the Russian Federation."  (MCA § 7.)

The parties agree that, if enforceable, the choice of law provisions require that Russian law govern Xsolla's breach of contract claim.  (*See* Tugushev Mot. 15–16; Opp'n Tugushev Mot. 23.)   Tugushev argues that these provisions "encompass[] all causes of action arising from or relating to those agreements," meaning they cover all of Xsolla's claims against him.  (Tugushev Mot. 15–18.)   Xsolla counters that these provisions do not apply to its statutory and tort claims.  (Opp'n Tugushev Mot. 23–24.)   Xsolla also argues that these choice of law provisions are unenforceable because there is no substantial relationship between Russian law and the contracts and applying Russian law is against California public policy.  (*Id.* at 24–26.)

"To determine the applicable substantive law, a federal court sitting in diversity applies the choice-of-law rules of the forum."  *Narayan v. EGL, Inc.*, 616 F.3d 895, 898 (9th Cir. 2010).   Where, as here, the parties have contracted that another jurisdiction's law will govern their disputes, California courts apply the framework set forth in *Nedlloyd Lines B.V. v. Superior Ct.*, 3 Cal. 4th 459 (1992).   *Gustafson v. BAC Home Loans Servicing, LP*, 294 F.R.D. 529, 535 (C.D. Cal. 2013).

"Under *Nedlloyd*, a trial court 'should first examine the choice-of-law clause and ascertain whether the advocate of the clause has met its burden of establishing that the various claims . . . fall within its scope.'"  *Id.* at 536 (quoting *Wash. Mut. Bank, FA v. Superior Ct.*, 24 Cal. 4th 906, 916 (2001)).   "Once a court determines that a claim falls within the scope of a choice-of-law clause, it must consider whether the clause is enforceable."  *Id.* at 537 (citing *Wash. Mut.*, 24 Cal. 4th at 916).   California courts follow section 187(2) of the Restatement (Second) of Conflict of Laws, under which "the proponent of the choice-of-law provision bears the burden of showing that

the chosen state 'has a substantial relationship to the parties or their transaction' or
'there is any other reasonable basis for the parties' choice of law.'" *Id.* (quoting
Restatement (Second) of Conflict of Laws § 187(2)(a)). "If either of these tests is met,
the choice-of-law provision will be enforced 'unless the other side can establish both
that the chosen law is contrary to a fundamental policy of California and that
California has a materially greater interest in the determination of the particular
issue.'" *Id.* (quoting *Wash. Mut.*, 24 Cal. 4th at 917).

As the parties agree that at least one of Xsolla's claims fall within the contracts'
choice of law provisions, the Court begins with whether these provisions are
enforceable. Tugushev argues that Russia bears a substantial relationship to the
parties or their transactions and there is a reasonable basis for selecting Russian law.
(Tugushev Mot. 16–17.) In support, Tugushev relies on the following facts: (1) he is
a Russian citizen[6]; (2) Xsolla has an office in Russia; (3) Russians founded Xsolla in
Russia; (4) a Russian citizen owns Xsolla's parent; and (5) Xsolla agreed to pay
Tugushev in rubles to his Russian bank account. (*Id.* at 16; Tugushev Reply 1.)

Only the second proffered fact is in dispute. (*See* Opp'n Tugushev Mot. 24–
25.) In a declaration, Xsolla's Chief Investment Officer declares that "Xsolla has no
presence in Russia and operates out of its headquarters in Sherman Oaks, California."
(Burkovskiy Decl. ¶ 3.) Tugushev counters that Xsolla's website lists a Russian
affiliate and an office in Perm, Russia. (Tugushev Reply 2 (citing Xsolla Family;
Xsolla Contact Us).) One of the webpages Tugushev offers identifies "Xsolla LLC"
as having an office in Russia. (Xsolla Family.) This is a different entity than Xsolla
(USA), Inc., the Plaintiff in this matter. (*See id.*; Tugushev Reply 1.) The other
webpage lists the same address provided for Xsolla LLC as one of Xsolla's office

---

[6] Tugushev also declares that he is "registered with the Russian authorities as a permanent resident."
(Tugushev Mot. Decl. ¶ 4.) Tugushev explains that he understands that under "Russian regulations,
unless and until an individual registers with the Russian authorities as residing outside of the Russian
Federation, that individual is considered a permanent resident of Russia." (*Id.*) Tugushev actually
currently resides in Portugal. (*Id.* ¶ 5.)

locations.  (Xsolla Website Help.)  This webpage does not specify which office belongs to which Xsolla entity.  (*See id.*)  The Court does not view these webpages and the Burkovskiy Declaration as conflicting.  Rather, it appears that Plaintiff Xsolla (USA), Inc. does not have an office in Russia, but that one of its affiliates does.

With these facts in mind, the Court turns to whether Russia bears a substantial relationship to the parties or their transactions or there is a reasonable basis for selecting Russian law.  "California courts have routinely found that the required substantial relationship exists where one of the parties is incorporated or maintains a principal place of business in the chosen state."  *SiFi Networks Fullerton, LLC v. Berkshire Hathaway Specialty Co.*, No. 8:23-cv-01417-FWS (JDEx), 2025 WL 842134, at *20 (C.D. Cal. Jan. 9, 2025) (quoting *BASF Corp. v. Cesare's Collision Repair & Towing, Inc.*, 364 F. Supp. 3d 1115, 1119 (E.D. Cal. 2019)).  Courts have done the same where a party is domiciled or resides in the chosen state.  *Bausch & Lomb Inc. v. Fusion Consulting Grp., Inc.*, No. 8:13-cv-00776-CJC (JPRx), 2014 WL 11858167, at *3 (C.D. Cal. Mar. 20, 2014).

Tugushev does not meet his burden to show that Russia bears a substantial relationship to the parties or their transactions, or that there is a reasonable basis for selecting Russian law.  Xsolla is a California corporation with a principal place of business in California, (SAC ¶ 10), and does not have an office in Russia, (*see* Burkovskiy Decl. ¶ 3).  While Xsolla *was once* incorporated in Russia, (Tugushev Decl. ¶ 14), it reincorporated in California, (*see* Tugushev Mot. 16), and the parties do not suggest that it was a Russian corporation at the time the contracts were executed and in effect, (*see, e.g.*, *id.*).  Tugushev does not show, nor offer any case law to support, how the citizenship of a company's founder or affiliate provides a basis to apply a chosen law in a case involving the defendant company, a separate entity.  (*See* Tugushev Mot.; Tugushev Reply.)

Meanwhile, Tugushev is a Russian citizen.  (Tugushev Decl. ¶¶ 3-4.)  However, he currently resides in Lisbon, Portugal, (*id.* ¶ 5), and executed the relevant contracts

from Montenegro, (*id.* ¶¶ 20, 23, 26).   Further, he did his work for Xsolla in Montenegro and Malaysia.  (*Id.* ¶ 29.)  Thus, there is no evidence that Tugushev lived in Russia while he worked for Xsolla, did any work for Xsolla while in Russia, or signed or negotiated any agreement with Xsolla while in Russia.  (*See id.*); *cf. Bausch & Lomb Inc.*, 2014 WL 11858167, at *3 (noting substantial relationship where a party is domiciled or resides in the chosen state).  Finally, Tugushev does not provide any support for the proposition that a contract requiring payment to a bank account in a certain jurisdiction constitutes a relationship sufficient to apply that jurisdiction's law. (*See* Tugushev Mot.; Tugushev Reply.)

Instead, Tugushev cites only two cases to support his argument.  (Tugushev Mot. 16.)  In one, the court found a substantial relationship where the contract called for the application of Nevada law and one of the parties was a Nevada company.  *See It's Just Lunch Int'l LLC v. Island Park Enter. Grp., Inc.*, No. 5:08-cv-00367-VAP (JCRx), 2008 WL 4683637, at *2 (C.D. Cal. Oct. 21, 2008).  In the other, the Ninth Circuit applied a California choice-of-law provision where the underlying transaction involved the sale of California property and one of the parties was a California resident.  *Consul Ltd. v. Solide Enters., Inc.*, 802 F.2d 1143, 1147 (9th Cir. 1986).  No similar facts are present in this case.

Accordingly, the Court finds that Tugushev fails to meet his burden to show that Russia bears a substantial relationship to the parties or their transactions, or there is a reasonable basis for selecting Russian law.   Given this, the choice of law provision is unenforceable, and the Court must apply California law.   The Court **DENIES** Tugushev's motion to dismiss based on the choice-of-law provision.

### 2.    *Extraterritoriality*

Next, Tugushev argues that Xsolla's non-contract claims must be dismissed because his alleged acts were done in Montenegro or Malaysia and the federal and California laws underlying Xsolla's claims have no extraterritorial application. (Tugushev Mot. 19–21.)

a. <u>DTSA</u>

As to an individual that is not a citizen or permanent resident alien of the United States, the DTSA "applies to conduct occurring outside the United States if . . . an act in furtherance of the offense was committed in the United States." *Beijing Meishe Network Tech. Co. v. TikTok Inc. (Beijing I)*, No. 23-CV-06012-SI, 2024 WL 1772833, at *11 (N.D. Cal. Apr. 23, 2024) (quoting 18 U.S.C. § 1837). Even putting aside Xsolla's "information and belief" allegation that Tugushev conspired with the other California-based Aghanim Founders to misappropriate trade secrets from Xsolla, (SAC ¶ 43), Xsolla alleges that "an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837(b). According to the SAC, Tugushev used the trade secrets he took from Xsolla to start a competing company with a principal place of business in California. (*E.g.*, SAC ¶¶ 2, 11.) If true, such actions would be in furtherance of misappropriation through disclosure or use of Xsolla's trade secrets. *See* 18 U.S.C. § 1839(5)(B) (defining "misappropriation" to include "disclosure or use of a trade secret of another without" consent); *Beijing Meishe Network Tech. Co. v. TikTok Inc. (Beijing II)*, No. 23-CV-06012-SI, 2024 WL 3522196, at *11 (N.D. Cal. July 23, 2024) (denying motion to dismiss for extraterritorial application of DTSA where plaintiff "adequately pled at least use of its trade secrets in the United States by the non-U.S." defendants). Thus, application of the DTSA to Tugushev is proper and this claim survives.

b. <u>California statutory and common-law claims</u>

Tugushev also challenges the application of California statutory and common law. (Tugushev Mot. 21.) California law presumes that the legislature "did not intend the statutes of this state to have force or operation beyond the boundaries of the state." *Norwest Mortg., Inc. v. Superior Ct.*, 72 Cal. App. 4th 214, 222 (1999). Unless the legislature explicitly indicates otherwise, "if the liability-creating conduct occurs outside of California, California law generally should not govern that conduct." *Oman v. Delta Air Lines, Inc.*, 889 F.3d 1075, 1079 (9th Cir. 2018). This includes

claims under the UCL and CUTSA.  *See Sullivan v. Oracle Corp.*, 51 Cal. 4th 1191, 1207 (2011) ("[T]he presumption against extraterritoriality applies to the UCL in full force."); *Vestis, LLC v. Caramel Sales, Ltd.*, No. 8:18-cv-02257-DOC (KESx), 2019 WL 11542355, at *6 (C.D. Cal. Nov. 5, 2019) (applying presumption against extraterritoriality to CUTSA claim).  Even if this presumption does not apply to California common law claims, Xsolla admits "the inquiry is whether the conduct which gives rise to liability occurs in California."  (Opp'n Tugushev Mot. 26.)

For the same reasons as with its DTSA claim, the presumption of extraterritoriality does not bar Xsolla's CUTSA claim.  However, this presumption does bar Xsolla's UCL and intentional interference claims as against Tugushev.  Xsolla contends that the extraterritoriality doctrine does not preclude those claims against Tugushev because they "are based upon [his] actions on behalf of his California-based company Aghanim, including making disparaging remarks to U.S.-based Xsolla customers."  (*Id.* at 27.)  But this is not sufficient California-based conduct to save the claims.  In the SAC, Xsolla does not allege Tugushev made disparaging remarks to *California* customers or that it otherwise suffered harm in *California*.  (*See* SAC); *Terpin v. AT&T Mobility, LLC*, 399 F. Supp. 3d 1035, 1047 (C.D. Cal. 2019) ("A plaintiff's residence alone is not sufficient to bring claims under the UCL . . . where the injuries occur outside of California.").  And, unlike with its misappropriation claims, Xsolla does not "include[] an allegation of domestic conduct" in these claims.[7]  *Addaday, Inc. v. Artist Int'l Co.*, No. 22-cv-05525-AB (PLAx), 2022 WL 1516053, at *10 (C.D. Cal. Feb. 22, 2022); (*see e.g.*, SAC ¶¶ 124, 130 (alleging scheme to steal Xsolla's trade secrets to found Aghanim).)

Accordingly, the Court **GRANTS** Tugushev's motion to dismiss Xsolla's intentional interference and UCL claims against him and **DENIES** Tugushev's motion

---

[7] To the extent Xsolla relies on its misappropriation allegations to support the viability of its UCL and intentional interference claims against Tugushev, such claims would be preempted for the reasons explained in the Court's First Order.  (*See* First Order 19–23; *cf.* SAC ¶ 124 (alleging that Tugushev used trade secret information to solicit and poach Xsolla's customers).)

as to Xsolla's DTSA and CUTSA claims.    While the Court cannot consider facts

outside the pleadings for Rule 12(b)(6) motions, the Court should consider such facts

to determine if amendment would be futile.  *See Broam v. Bogan*, 320 F.3d 1023,

1026 n.2 (9th Cir. 2003).  Xsolla's Chief Investment Officer declares that, based on an

internal investigation, "Xsolla has learned that Aghanim approached and converted at

least one California-based Xsolla customer by disparaging Xsolla."  (Burkovskiy

Decl. ¶ 6.)  To the extent Xsolla can make such allegations against Tugushev, this

could potentially support the application of the UCL and California common law

against Tugushev.  Xsolla has also not had an opportunity to cure this deficiency, as

this is the first time any party raised the extraterritoriality doctrine as a basis for

dismissal in this case.    Therefore, the Court's dismissal as to these claims for

extraterritorial application is **with leave to amend**.

## VI.    AGHANIM'S MOTION TO DISMISS

The Court turns to Aghanim's motion to dismiss each of Xsolla's claims against

it pursuant to Rule 12(b)(6), which motion Tugushev joins.  (Mot. Aghanim; Joinder.)

### A.    Misappropriation Claims (Counts I and II)

Xsolla alleges Aghanim misappropriated trade secrets in violation of the DTSA

and CUTSA.    (SAC ¶¶ 87–126.)    These statutes "share the same pleading

requirements for the identification of trade secrets."  *Alta Devices, Inc. v. LG Elecs.,

Inc.*, 343 F. Supp. 3d 868, 881 (N.D. Cal. 2018); *see also InteliClear, LLC v. ETC

Glob. Holdings, Inc.*, 978 F.3d 653, 657 (9th Cir. 2020) ("Courts have analyzed these

claims together because the elements are substantially similar.").  To assert a trade

secret misappropriation claim, a plaintiff must allege that: (1) the plaintiff owned a

trade secret, (2) the defendant misappropriated it, which (3) damaged the plaintiff.

*InteliClear, LLC*, 978 F.3d at 657–58.

In its First Order, the Court concluded that Xsolla adequately alleged that it

owned a trade secret.  (First Order 8–16.)  But the Court dismissed Xsolla's DTSA

and CUTSA claims because Xsolla failed to adequately allege that Aghanim

misappropriated the trade secrets. (*Id.* at 16–19.)   Aghanim once again moves to dismiss these misappropriation claims for Xsolla's failure to adequately plead that it owned a trade secret and that Aghanim misappropriated the trade secrets. (Aghanim Mot. 7–17.)

> 1.   *Trade Secrets*

To adequately plead the existence of a trade secret, a plaintiff must describe the trade secret with sufficient particularity. *Cisco Sys., Inc. v. Chung*, 462 F. Supp. 3d 1024, 1047 (N.D. Cal. 2020). Additionally, a plaintiff must allege that the information derives independent economic value from its secrecy and the owner has "taken reasonable measures to keep such information secret." 18 U.S.C. § 1839(3)(A)–(B); *see also* Cal. Civ. Code. § 3426.1(d)(1)–(2). The Court previously held that Xsolla adequately alleged each of these elements. (First Order 8–16.)

Nevertheless, Aghanim asks the Court to revisit its ruling that Xsolla pleaded reasonable measures to keep its information secret. (Aghanim Mot. 12–16.) Aghanim argues "circumstances have changed" based on Xsolla's new allegations that "undermine the reasonableness of Xsolla's protective measures." (*Id.* at 13–14.)

But Xsolla continues to adequately allege it took reasonable measures to protect its information. The Court's ruling as to reasonable measures in the First Order applies equally to the SAC. (*See* First Order 14–16.) Xsolla still alleges that most employees sign confidentiality agreements and all employees sign a handbook detailing the importance of confidentiality to Xsolla and warning of consequences of disclosing trade secrets. (SAC ¶¶ 28, 33, 111.) Xsolla also alleges that it restricted access to trade secret information to workers "on a need-to-know basis, with username and password credentialling in place." (*Id.* ¶ 111.) Aghanim's arguments, which go to the reasonableness of Xsolla's measures, require an inherently "'fact-intensive' analysis" more appropriately left to the factfinder. (*See* First Order 15 (quoting *InfoSpan, Inc. v. Emirates NBD Bank PJSC*, No. 8:11-cv-1062-JVS (ANx), 2015 WL 13357646, at *3 (C.D. Cal. May 6, 2015)).) They do not support a finding that

Xsolla's measures were not reasonable as a matter of law.  This is especially so where Xsolla alleges that the Aghanim Founders, who include former CEOs and CTOs of Xsolla and its subsidiary, (SAC ¶¶ 30, 35, 37), knew how "to avoid detection" of Xsolla's protective measures, (*id.* ¶ 111).  Whether this is factually correct is not a question for the Court when deciding a Rule 12(b)(6) motion.  Accordingly, the Court again concludes Xsolla has alleged it owned a trade secret.

### 2.    *Misappropriation*

Under both the DTSA and the CUTSA, "misappropriation" means either (1) the "[a]cquisition of a trade secret by another person who knows or has reason to know that the trade secret was acquired by improper means;" or (2) the "[d]isclosure or use of a trade secret of another without express or implied consent."  18 U.S.C. § 1839(5); Cal. Civ. Code § 3426.1(b).

The "Twombly plausibility standard . . . does not prevent a plaintiff from pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant or where the belief is based on factual information that makes the inference of culpability plausible."  *Soo Park v. Thompson*, 851 F.3d 910, 928 (9th Cir. 2017) (quoting *Arista Recs., LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010)).

In finding that Xsolla failed to adequately allege Aghanim misappropriated trade secrets in the FAC, the Court did not credit any of Xsolla's many "information and belief" allegations.  (First Order 17.)  This is because Xsolla failed to allege or demonstrate that these facts "are peculiarly within the possession and control of" Aghanim or that Xsolla's "belief is based on factual information that makes the inference of culpability plausible."  (*Id.* (quoting *Soo Park*, 851 F.3d at 928).)  The Court found that Xsolla's remaining allegations, that "Aghanim's Founders accessed trade secrets," "Aghanim offered 'eerily identical' services to Xsolla," and "Aghanim developed its applications 'in record time,'" did not support a plausible inference that Aghanim misappropriated Xsolla's trade secrets.  (*Id.* at 18.)

In the SAC, Xsolla removed some "information and belief" qualifiers to its allegations. For example, Xsolla now alleges that "Aghanim could not have developed its platform offering in such short time without the improper use of Xsolla technology, trade secrets, and confidential information." (SAC ¶ 74; *compare* FAC ¶ 58 (alleging same on "information and belief").) Still, Xsolla keeps some "information and belief" allegations in its SAC. (*Compare* SAC ¶ 45 ("It is believed that Andry and Tugushev spent much of their last month at Xsolla secretly working with Golubitsky to start up a competing company and collecting all of the additional data and information they needed to copy Xsolla's business.") *with* FAC ¶ 46 (same).)

This time, however, Xsolla adequately pleads facts indicating a plausible inference of misappropriation and that such facts are peculiarly within the possession and control of Aghanim and Tugushev. In the SAC, Xsolla adds specific allegations showing the Aghanim's Founders' access to trade secrets. For example, Xsolla alleges that, on October 21, 2022, Andry emailed a link to an internal Xsolla platform, JIRA, to his personal email. (SAC ¶ 47.) This platform "contain[ed] a whole host of trade secret information, including links to Sales Force, Github (Xsolla's confidential coding repository), and Loonshots (Xsolla's research and development project management platform that tracks ideas and improvements on Xsolla's services offerings in the process of being developed)." (*Id.*) This link "provid[ed] [Andry] with unrestricted access to these highly proprietary and trade secret data repositories outside of the work setting." (*Id.*) Xsolla further alleges that each of Aghanim's offerings "could only have been created through the improper use of Xsolla's trade secret and confidential information," which included "information Andry could access through the JIRA link." (*Id.* ¶ 76.)

Xsolla also alleges at least one specific instance in which one of Aghanim's Founders accessed Xsolla's non-public information after having been terminated. Xsolla alleges that Tugushev "continued to access a dummy Publisher account originally created to assist him in his work at Xsolla Labs," using a personal email to

access "non-public Xsolla information" after he was terminated.  (*Id.* ¶ 48.)  Per the SAC, shortly after filing this lawsuit, Tugushev created a second dummy account using a different email address to access this platform.  (*Id.* ¶ 49.)

Aghanim argues that the allegation of a second dummy account cannot be credited because "Xsolla pleads no facts that would supports its allegation that the email used for the second account" belongs to Tugushev.  (Aghanim Mot. 3 n.3; *see* Tugushev Decl. ¶ 30 (declaring this email "is not my email address")).)  Aghanim also claims this incident is irrelevant because the information accessed was only non-public, not a trade secret.  (Aghanim Mot. 6; *see* Opp'n Aghanim Mot. 7 n.5 (agreeing that Publisher does not contain trade secrets).)  As to the first argument, Xsolla alleges that the second "dummy" email address has "Tugushev" in it—that is enough to plausibly plead it belonged to Tugushev at this stage.  As to the second argument, the Court agrees this does not support that, through this access, Tugushev misappropriated trade secrets.  What it does show is evidence that, even after being terminated, Tugushev improperly accessed non-public Xsolla information.  This is circumstantial evidence that, combined with Xsolla's other allegations, plausibly supports an inference that Tugushev improperly accessed trade secrets outside of Xsolla's detection.

It remains true that "[a]llegations of similarity, without more, do not support a claim of misappropriation of trade secrets."  (First Order 18 (quoting *Brown v. Adidas Int.*, 938 F. Supp. 628, 634 (S.D. Cal. 1996)).  But Xsolla now pleads something more.  In addition to alleging similarity between Xsolla's and Aghanim's offerings, (SAC ¶ 22), Xsolla now alleges (1) Aghanim could not have obtained this similarity without misappropriating Xsolla's trade secrets, (*id.* ¶ 74), (2) Aghanim's Founders had specific access to those trade secrets outside of work, (*id.* ¶ 76), and (3) instances where Aghanim's Founders attempted to access non-public data without prior authorization, (*id.* ¶¶ 48–49).  Xsolla does not allege exactly how Aghanim obtained the trade secret information.  (*See, e.g.*, Aghanim Reply 3 (noting that Xsolla does not

allege "Andry actually used the JIRA link" (emphasis omitted).)  But, as Aghanim's authorities demonstrate, a plaintiff need not allege "exactly how [d]efendants improperly . . . obtained the alleged trade secret."  *E. & J. Gallo Winery v. Instituut Voor Landbouw-En Visserijonderzoek*, No. 1:17–CV–00808–DAD–EPG, 2018 WL 2463869, at *7 (E.D. Cal. June 1, 2018) (second alteration in original) (cited in Aghanim Reply 4.).

Finally, Xsolla alleges that it would not always be able to track how Aghanim's Founders accessed its information.  (*See* SAC ¶ 115 (detailing ways founders could have accessed information without Xsolla being able to track).)  Thus, Xsolla shows that its "information and belief" allegations represent facts "peculiarly within the possession and control of" Aghanim and Tugushev, and that its "belief is based on factual information that makes the inference of culpability plausible."  (First Order 17 (quoting *Soo Park*, 851 F.3d at 928).)   Accordingly, the Court finds that Xsolla adequately alleges that Aghanim's and Tugushev's misappropriated Xsolla's trade secrets.  The Court **DENIES** Aghanim's Motion as to the misappropriation claims.

## B.   Federal Trademark Infringement (Count VI)

In trademark infringement cases, a plaintiff must establish: (1) ownership of a trademark right and (2) "that the defendant's use of the mark is likely to cause consumer confusion."  *Network Automation, Inc. v. Advanced Sys. Concepts, Inc.*, 638 F.3d 1137, 1144 (9th Cir. 2011).

In the FAC, Xsolla claims that Aghanim "plastered" Xsolla's mark "all over Aghanim's materials," causing customers "to wonder whether the companies were affiliated or otherwise part of the same entity" and resulting in "customers inquir[ing] as to the relationship between the companies."  (FAC ¶ 53.)  Xsolla also alleged that its "name is prominently displayed on the home page of the Aghanim website, leading some customers to believe the companies are connected or affiliated with one

another." (*Id.* ¶ 62.) Based on these allegations, the Court held that Xsolla adequately alleged a claim for trademark infringement.[8] (First Order 23–25.)

Even though Xsolla alleges these same facts in the SAC, (¶¶ 62, 78), Aghanim again moves to dismiss this trademark infringement claim. (Aghanim Mot. 19.) This time, Aghanim argues that Xsolla's new allegations "distinguish itself from Xsolla," (*id.*), such that it undermines that Xsolla's allegations support that its marks could have "led consumers to reasonable conclude [Xsolla] sponsored or endorsed Aghanim and its products. (*Id.* (alteration in original) (second quoting First Order 25).) As the Court has already concluded, Xsolla alleges a likelihood of confusion and that Aghanim's use of Xsolla's trademark does not amount to fair use. (First Order 25.) Xsolla's new allegations do not alter this conclusion. Aghanim could have used Xsolla's trademark to confuse prospective customers to get them in the door and then later disparage Xsolla in pitches to those (or different) prospective customers. Accordingly, the Court **DENIES** Aghanim's motion to dismiss the trademark claim.

## C. Interference with Prospective Economic Advantage, Interference with Contract, and Unfair Competition (Counts III, IV, and V)

In its First Order, the Court dismissed all or part of Xsolla's claims for intentional and negligent interference with prospective economic advantage, intentional interference with contract, and UCL violations on the basis that CUTSA preempted those claims. (First Order 19–23.) The Court permitted Xsolla to amend these claims. (*Id.* at 19–23.) In the SAC, Xsolla reasserts all but the negligent interference claim. (SAC ¶¶ 133–59.)

CUTSA "preempt[s] all claims premised on the wrongful taking and use of confidential business and proprietary information," regardless of whether that information is a trade secret. *Teva Pharm. USA, Inc. v. Health IQ, LLC*, No. 8:13-cv-00308-CJC (RNBx), 2013 WL 12132029, at *5 (C.D. Cal. Apr. 29, 2013). As such,

---

[8] The Court also ruled that, as alleged in the FAC, "Aghanim's use of Xsolla's mark featuring the Aghanim Founders' past employment is nominative fair use." (First Order 24.)

CUTSA preempts Xsolla's claims to the extent they arise from the "same nucleus of facts as trade secret misappropriation." *K.C. Multimedia, Inc. v. Bank of Am. Tech. & Ops., Inc.*, 171 Cal. App. 4th 939, 962 (2009). Thus, the Court examines the elements and allegations for each claim and dismisses those that Xsolla cannot assert without the same facts supporting its trade secret misappropriation claims. *See id.* at 959.

### 1.    *Interference with Prospective Economic Advantage (Count III)*

Under California law, to assert a claim for intentional interference with prospective economic advantage, a plaintiff must allege: (1) an economic relationship between the plaintiff and a third party, "with the probability of future economic benefit to the plaintiff"; (2) "the defendant's knowledge of the relationship"; (3) the defendant's intentional acts "designed to disrupt the relationship"; (4)" actual disruption of the relationship"; and (5) "economic harm to the plaintiff proximately caused by the" defendant's acts. *CRST Van Expedited, Inc. v. Werner Enters., Inc.*, 479 F.3d 1099, 1108 (9th Cir. 2007) (quoting *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1153 (2003)).

In the SAC, Xsolla alleges that Aghanim "approaches Xsolla customers and potential customers that Aghanim's founders . . . know Xsolla has relationships with and tries to convert them by providing false information about Xsolla's inner working, pricing and technical capabilities." (SAC ¶ 135.) Xsolla also alleges that Aghanim and Tugushev interfered with Xsolla's economic relationships "by spreading disparaging and false rumors in the market and misrepresenting their own capabilities to make their services seem better than Xsolla's." (*Id.* ¶ 138.) Xsolla identifies false statements such as "that Xsolla is going bankrupt," (*id.* ¶ 83a), "that Xsolla's technology is unstable or antiquated," (*id.* ¶ 83b), and "that Xsolla's pricing formula contains hidden or improper fees," (*id.* ¶ 83e). In one instance, Xsolla alleges that it was negotiating a contract with a potential customer "when Aghanim approached the customer's parent company and misrepresenting Xsolla's pricing, . . . causing the customer to sign up with Aghanim instead." (*Id.* ¶ 85.)

Aghanim argues that Xsolla's intentional interference claim relies on the CUTSA claim because Aghanim knew which customers to poach due to it misappropriation of Xsolla's trade secrets.  (Aghanim Mot. 18.)  True, Xsolla alleges that its "customer lists, customer-specific pricing information, and other customer information" are trade secrets.  (SAC ¶ 88a; *see also, e.g., id.* ¶ 90 (listing "compilation of information about established customers" that are trade secrets).)  But, as the Court previously noted, "Xsolla does not allege that a list of its customers in isolation—without additional client information is a trade secret."  (First Order 11 & n.6.)  This makes it possible for Aghanim and Tugushev to have interfered with Xsolla's prospective customer relationships without using Xsolla's trade secret customer information.  Accordingly, even though Xsolla also alleges that Aghanim and Tugushev used Xsolla's trade secrets for "soliciting and poaching Xsolla's customers" in its CUTSA claim, (SAC ¶¶ 129–30), the "wrongful acts alleged by" Xsolla in its intentional interference claim do not "plainly and exclusively spell out only trade secrets misappropriation."  *Neuman v. B2 Brands, Inc.*, No. 5:07-cv-01025-MLG, 2010 WL 11596467, at *8 (C.D. Cal. Feb. 17, 2010) (finding claim preempted where "claims cannot survive without the 'trade secret facts'").  Therefore, the Court finds CUTSA does not preempt Xsolla's claim for interference with prospective economic advantage.  Accordingly, the Court **DENIES** Aghanim's motion to dismiss Xsolla's UCL claim.

### 2.   *Interference with Contract (Count IV)*

To plead a claim for intentional interference with contract under California law, a plaintiff must allege: "(1) a valid contract between plaintiff and a third party; (2) defendant's knowledge of this contract; (3) defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage." *3500 Sepulveda, LLC v. Macy's W. Stores, Inc.*, 980 F.3d 1317, 1325–26 (9th Cir. 2020) (quoting *Quelimane Co. v. Stewart Title Guar. Co.*, 19 Cal. 4th 26, 77 (1998)).

Xsolla contends that Aghanim and Tugushev "spread[] disparaging and false rumors in the market and misrepresent[ed] Aghanim's capabilities to make its services seem better than Xsolla's." (SAC ¶ 146.) Xsolla alleges one specific instance of this conduct: "Aghanim converted an existing Xsolla customer by claiming Xsolla could not handle the customer's needs." (*Id.* ¶¶ 84, 146.) Critically, Xsolla alleges that Aghanim's Founders "knew" this claim "was untrue through their previous employment at Xsolla." (*Id.* ¶¶ 84.)

Unlike with the interference with prospective economic advantage claim, Xsolla fails "to allege an intentional interference with contract claim that arises out of a set of operative facts distinct from those relied upon to support its trade secret misappropriation claims," *Cisco Sys., Inc.*, 462 F. Supp. 3d at 1058–59. Here, Xsolla does not allege facts showing it is possible for Aghanim and Tugushev to have interfered with Xsolla's customer contract without using Xsolla's trade secret customer information. In its misappropriation claims, Xsolla alleges that its trade secret customer and pricing information allows it "to customize pricing and product offerings based upon individual customers' *needs and challenges*." (SAC ¶ 104 (emphasis added); *see also, e.g., id.* ¶ 90 (listing customer-specific information, including "details about the customer's products and how they use Xsolla's offerings")). As alleged, Tugushev and Aghanim must have relied on Xsolla's trade secret information to have "claim[ed] Xsolla could not handle the customer's *needs*," which they "knew . . . was untrue through [the Aghanim Founders'] previous employment at Xsolla." (*Id.* ¶ 84 (emphasis added).). The "gravamen of the wrongful conduct" for this and the CUTSA claim is the same: the wrongful use of Xsolla's trade secrets. *K.C. Multimedia, Inc.*, 171 Cal. App. 4th at 961. As such, the Court **GRANTS** Aghanim's Motion and dismisses Xsolla's claim for intentional interference with contract. However, the Court does not find further amendment would be futile, so this dismissal is **with leave to amend**.

3. *Unfair Competition (Count V)*

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. In the First Order, the Court held that CUTSA does not preempt Xsolla's allegations that Aghanim "improper[ly] reference[d]" Xsolla's name in solicitation of customers and advertisement on its website and "falsely and misleadingly advertised its capabilities and technological developments to compete with Xsolla." (First Order 22 (quoting FAC ¶¶ 117c–d, 118).) Xsolla realleges the same here. (*See* SAC ¶¶ 153c–d, 154.) Aghanim challenges these claims using the same arguments it raised to dismiss Xsolla's trademark infringement claims. (Aghanim Mot. 19–20.) As discussed above, the Court rejects Aghanim's attempts to dismiss Xsolla's trademark infringement claim. Therefore, CUTSA does not preempt at least some of Xsolla's UCL claim. Accordingly, the Court **DENIES** Aghanim's motion to dismiss Xsolla's UCL claim.

## VII.   AGHANIM'S MOTION TO STRIKE

Finally, the Court turns to Aghanim's motion to strike some of Xsolla's allegations. (*Id.* at 20–22.) Motions to strike are disfavored and "will usually be denied unless the allegations have no possible relation to the controversy and may cause prejudice to one of the parties." *Friedman v. 24 Hour Fitness USA, Inc.*, 580 F. Supp. 2d 985, 990 (C.D. Cal. 2008).

First, Aghanim asks the Court to strike Xsolla's allegations regarding Andry and Golubitsky. (Aghanim Mot. 20–22.) It argues that because Andry and Golubitsky are not parties to this lawsuit, Xsolla's allegations against them are "scandalous, immaterial, . . . impertinent," and prejudicial. (*Id.* at 20–21.)

An "impertinent" allegation "consists of statements that do no[t] pertain, and are not necessary, to the issues in question." *City of Los Angeles v. Citigroup Inc.*, 24 F. Supp. 3d 940, 956 (C.D. Cal. 2014) (quoting *Fogerty*, 984 F.2d at 1527). An "immaterial" allegation "has no essential or important relationship to the claim for relief or the defenses being pleaded." *Id.* (quoting *Fogerty*, 984 F.2d at 1527).

Meanwhile, "scandalous" allegations "bear[] no possible relation to the controversy or may cause the objecting party prejudice." *Id.*

In the SAC, Xsolla's allegations concerning Andry and Golubitsky directly relate to Xsolla's claims. For example, Xsolla uses them to support its allegations of reasonable measures to protect its trade secrets. (*See* SAC ¶¶ 30–36; 43–44.) More fundamentally, to allege Aghanim misappropriated Xsolla's trade secrets, Xsolla must show how Aghanim had access to these trade secrets. Even if Xsolla's allegations show that Aghanim got this information from Tugushev, (*see id.* ¶¶ 48–49), it is still relevant—even if not necessary—that Andry and Golubitsky also shared trade secrets with Aghanim, (*see id.* ¶ 47). This is especially true where Xsolla's alleges Tugushev, Andry, and Golubitsky worked together to steal Xsolla's trade secrets to start a competitor. (*See id.* ¶¶ 2–3, 43.) And Aghanim is a corporation that acts through individuals. Allegations regarding Andry's and Golubitsky's actions concern Aghanim's liability. (*See id.*) Finally, Aghanim does not show how *it* is prejudiced by the allegations. *See Citigroup Inc.*, 24 F. Supp. 3d at 956 (explaining that "scandalous" allegations "may cause the objecting party prejudice").

Second, Aghanim asks the Court to strike Xsolla's allegations concerning events subsequent to its filing of the initial complaint as "outside of the permitted scope for an amendment." (Aghanim Mot. 22; *see, e.g.*, SAC ¶ 49 (alleging Tugushev made "a second dummy account" after Xsolla filed this suit); *id.* ¶ 46 (alleging misappropriation "through April 2024").) In the First Order, the Court dismissed some of Xsolla's claims with leave to amend. (First Order 26.) Even had the Court limited the scope of Xsolla's amendment, these allegations relate to curing the noted deficiencies.

For these reasons, the Court **DENIES** Aghanim's Motion to Strike.

## VIII.    CONCLUSION

For the above reasons, the Court **GRANTS IN PART AND DENIES IN PART** Tugushev's Motion and Aghanim's Motion. (ECF Nos. 58, 60.) The Court

**DISMISSES** Xsolla's third (intentional interference with prospective economic relations) and fifth (violation of the UCL) causes of action as to Tugushev **WITH LEAVE TO AMEND**.  The Court also **DISMISSES** Xsolla's fourth (intentional interference with contract) cause of action as to both Aghanim and Tugushev **WITH LEAVE TO AMEND**.  All other bases for dismissal are **DENIED**.  The Court also **DENIES** Aghanim's Motion to the extent it seeks to strike allegations from the SAC.

If Xsolla wishes to amend, it must file a Third Amended Complaint no later than **fourteen days** from the date of this Order, in which case Aghanim and Tugushev shall answer or otherwise respond within **fourteen days** of the filing.  If Xsolla does not timely amend, the dismissal of the third and fifth causes of action as to Tugushev, and the fourth cause of action as to Tugushev and Aghanim, shall be deemed a dismissal with prejudice as of the lapse of the deadline to amend.  Xsolla's amendment must be limited to allegations concerning the extraterritorial application of the third, fourth, and fifth causes of action against Tugushev and whether the fourth cause of action is preempted.

To the extent Xsolla amends and Defendants file a motion to dismiss the Third Amended Complaint, the Court reminds the parties that, under Rule 12(g)(2), "a party that makes a motion under [Rule 12] must not make another motion under this rule raising a defense or objection that was available to the party but omitted from its earlier motion."  The Court will summarily deny any such arguments for dismissal.

**IT IS SO ORDERED.**

April 28, 2025

_____
**OTIS D. WRIGHT, II**
**UNITED STATES DISTRICT JUDGE**