**BLANK ROME LLP**
Dennis Ehling (SBN 168892)
Dennis.Ehling@blankrome.com
2029 Century Park East | 6th Floor
Los Angeles, CA 90067
Telephone: 424.239.3400
Facsimile: 424.239.3434

Michael A. Iannucci (Admitted *PHV*)
Michael.Iannucci@blankrome.com
One Logan Square
Philadelphia, PA 19103
Telephone: 215.569.5500
Facsimile: 215.569.5555
**Additional Counsel on Signature Page*

*Attorneys for Xsolla (USA), Inc.*
*and Aleksandr Agapitov*

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

XSOLLA (USA), INC., a California Corporation,

Plaintiff and Counterdefendant,

v.

AGHANIM INC., a Delaware Corporation; ALBERT TAGIROVICH TUGUSHEV; and DOES 1 through 50,

Defendants, Counterclaimant, and Third-Party Plaintiff (Aghanim),

v.

ALEKSANDR AGAPITOV, an individual,

Third-Party Defendants.

Case No.: 2:24-cv-02116-ODW-AJR

*[Assigned to the Hon. Otis D. Wright II]*

**PLAINTIFF XSOLLA (USA), INC.'S SUPPLEMENTAL BRIEF IN SUPPORT OF DESIGNEE ACCESS TO AEO MATERIAL AND IN RESPONSE TO DEFENDANTS' RESPONSE TO NOTICE OF FILING DECLARATION OF CARLA BEDROSIAN (DKT. 199)**

**[DISCOVERY MATTER]**

Complaint Filed: March 14, 2024
SAC Filed: October 1, 2024
Trial Date: May 18, 2027

## I. INTRODUCTION

Defendants' Response (Dkt. 199) recasts Ms. Bedrosian's declaration (Dkt. 198, Ex. A, "Bedrosian Decl.") as a confession that she is a competitive decision-maker. It is not. Defendants reach that result by trimming the quotations upon which they rely, dropping the qualifying language that immediately follows them, and substituting a standard untethered from the one the Court set: whether the designee is "involved in competitive business decision related to the material they propose to review." (Dkt. 183 at 6).

Xsolla does not agree with Defendants' characterization of the record, of the Court's October 30, 2026 Order, or of Ms. Bedrosian's role. However, for the avoidance of doubt, Xsolla addresses below each point Defendants raise. One point deserves emphasis at the outset: in five pages, Defendants never identify a single, concrete harm that Aghanim would suffer if Ms. Bedrosian, under the safeguards she has sworn to follow, reviewed the three categories of material that remain designated AEO. Defendants bear the burden of justifying the restriction they seek. They have not carried it.

## II. XSOLLA HAS ADDRESSED EACH OF THE COURT'S DIRECTIVES

Defendants contend that Xsolla took only the fourth of the four steps described in the Court's Order. (Dkt. 199 at 1). Not so. Ms. Bedrosian's declaration, filed in response to that Order, addresses each.

### A. A Designee Remains Necessary After the De-Designation Process

The Court invited Xsolla to consider, after reviewing Aghanim's updated designations, "whether a designee is still necessary, if so why." (Dkt. 183 at 6). Xsolla did so. Even after the Court-ordered review and downgrading of designations, Aghanim continues to designate as AEO: (i) documents referencing Xsolla employees, former employees, or contractors that relate to Xsolla's claims and to Aghanim's interference counterclaims; (ii) the identities of the third-party investors with which Aghanim contends Xsolla interfered; and (iii) information concerning

Aghanim's efforts, if any, to mitigate that alleged interference. (Bedrosian Decl. ¶ 9). Ms. Bedrosian needs that information "to investigate the underlying facts and to advise and direct Xsolla's outside counsel accordingly in this litigation, which I directly oversee on Xsolla's behalf." (*Id.*). That is the "why."

The need is concrete. These facts strike at the core of the solicitation and interference claims in this case, and they are facts that only Xsolla, through its counsel, is positioned to investigate.

**B. <u>Ms. Bedrosian Remains the Appropriate Designee</u>**

The Court asked whether "perhaps" someone else in Xsolla's legal department "would be a better fit." (Dkt. 183 at 6). Xsolla considered that question, and the answer is no. Ms. Bedrosian leads the legal department and directly oversees this litigation. (Bedrosian Decl. ¶¶ 4, 9, 18). Every other lawyer in the department reports to her. Substituting a subordinate would not reduce any risk Defendants posit. It would only interpose an additional layer between the person directing the litigation and the information needed to direct it. That the department has more than 30 lawyers, (*id.* ¶ 11), says nothing about whether any of them would be better situated, and Defendants identify no one and no criterion by which another lawyer would be. Defendants' objection is not to Ms. Bedrosian in particular; it is to any in-house designee at all, which is the position the Court has already declined to adopt. (*See* Dkt. 173 at 2, "Aghanim objects to Ms. Bedrosian on the grounds that she is not 'impartial' … But lack of neutrality is not a reason to disqualify Ms. Bedrosian as Xsolla's designee.")

**C. <u>Xsolla Has Identified the Material Ms. Bedrosian Would Review</u>**

Defendants call the three categories "vague and open-ended." (Dkt. 199 at 4). But, that ignores that each is defined by reference to Aghanim's own post-downgrade AEO designations, which Aghanim made and is uniquely positioned to identify. (Bedrosian Decl. ¶ 9). Defendants' reference to "a database with over 74,000 contacts" (Dkt. 199 at 4, citing Dkt. 173 at 6) is a *non sequitur*: by Defendants' own

description, that database is Xsolla's production, not Aghanim's AEO material, and nothing in Ms. Bedrosian's declaration seeks it.

Moreover, the absence of Bates numbers creates no ambiguity. The Court asked Xsolla to identify "what the material is" (Dkt. 183 at 6), not to compile a document-by-document list, and Aghanim, as the designating party, already knows which of its documents fall within the categories it continues to designate. Defendants' demand for Bates numbers is simply a further hurdle the Court did not impose.

**D. Ms. Bedrosian Has Provided the Declaration the Court Requested**

Ms. Bedrosian has declared, under penalty of perjury, that she does not set pricing or commercial terms offered to customers, select customers, prospects, or partners, make hiring, compensation, or other personnel decisions outside the legal department, or set or approve product design or development strategy. (Bedrosian Decl. ¶ 6). She has declared that she is not involved in competitive business decisions related to any category of information Aghanim has identified as sensitive (*id.* ¶ 8), or to the specific material she seeks (*id.* ¶ 9). That is precisely what the Court asked for.

## III. DEFENDANTS MISCHARACTERIZE MS. BEDROSIAN'S DECLARATION

**A. Ms. Bedrosian Is Not Involved in Competitive Decision-Making Related to the Material**

Defendants argue that Ms. Bedrosian's disclaimers are "not the test" because competitive decision-making includes "advice and participation in" business decisions. (Dkt. 199 at 2). But, Defendants omit the rest of the definition. *U.S. Steel* defines competitive decision-making as "counsel's advice and participation in any or all of the client's decisions (pricing, product design, etc.) made in light of similar or corresponding information about a competitor." *U.S. Steel Corp. v. United States*, 730

F.2d 1465, 1468 n.3 (Fed. Cir. 1984). The inquiry is tied to the information at issue, which is exactly how this Court framed it. (Dkt. 183 at 6).

Further, *Brown Bag* requires a fact-specific balancing of the risk of inadvertent disclosure against the harm to the party denied access, not a rule that any lawyer who attends business meetings is disqualified. *Brown Bag Software v. Symantec Corp.*, 960 F.2d 1465, 1470 (9th Cir. 1992). The Ninth Circuit adopted *U.S. Steel*'s definition verbatim, describing competitive decision-making as "advising on decisions about pricing or design 'made in light of similar or corresponding information about a competitor,'" and directed courts to "examine factually all the risks and safeguards surrounding inadvertent disclosure." *Id.* The facts that drove the result in *Brown Bag* confirm how far Defendants' position strays from that standard.

There, the in-house lawyer was a newly hired, sole legal advisor *and personnel manager* at a company of thirteen or fourteen employees, responsible for "a gamut of legal issues, including contracts, marketing, and employment," and the material he sought was the competitor's source code, development plans, and beta-tester identities. *Id.* at 1469-71. Because those duties "would necessarily entail advising his employer in areas relating to [Defendants'] trade secrets," such as "beta tester employment or other marketing strategies," knowledge of the secrets would have placed him in an "untenable position." *Id.* at 1471.

Ms. Bedrosian is that lawyer's opposite. She makes no personnel decisions outside the legal department, sets no pricing, product, or marketing strategy, and seeks no Aghanim source code, roadmap, or customer information. She seeks material about Xsolla's own employees, investors, and Aghanim's alleged mitigation. (Bedrosian Decl. ¶¶ 6, 8-9, 16). Given Ms. Bedrosian's role, the risk *Brown Bag* identified simply does not exist here. Indeed, even on its far more troubling facts, *Brown Bag* did not impose a categorical bar. It approved an order that preserved access through an independent consultant, and it faulted the in-house lawyer for

relying on an alleged "unfettered right" rather than a factual showing. *Id.* at 1469, 1471-72. Xsolla has made precisely the factual showing *Brown Bag* demands.

A general counsel who advises business teams on legal risk while those teams make the business decisions is doing exactly what in-house counsel do. (Bedrosian Decl. ¶¶ 6, 16). If that were disqualifying, no in-house lawyer could ever serve as a designee, and the designee framework the Court adopted would be null.

### B. Ms. Bedrosian's Compliance Oversight of Human Resources Does Not Overlap With the Material

Defendants next argue that because Xsolla's human resources function reports to Ms. Bedrosian, knowledge of how Aghanim "recruits, deploys, and compensates personnel" would inform her oversight. (Dkt. 199 at 2-3). But, the reporting line Defendants cite is expressly limited: human resources reports to her "for that process and compliance oversight," and she makes "no hiring, compensation, or other personnel decisions for anyone outside the legal department." (Bedrosian Decl. ¶ 5). On personnel matters, her role "is limited to ensuring that Xsolla's employment policies, practices, and processes comply with applicable law." (*Id.* ¶ 6). Whether a policy complies with the law does not turn on what a competitor pays.

Defendants' own parenthetical for *MMCA Grp., Ltd. v. Hewlett-Packard Co.*, No. C-06-7067 MMC (EMC), 2009 U.S. Dist. LEXIS 59583, at *5 (N.D. Cal. June 26, 2009), describes counsel whose knowledge of a competitor's employment contract terms would inform advice about her company's own employment contracts. (Dkt. 199 at 3). Ms. Bedrosian does not seek Aghanim's compensation structures. She seeks documents that reference *Xsolla's* own current and former employees and contractors and that bear on the claims and counterclaims. (Bedrosian Decl. ¶ 9). Aghanim suffers no competitive injury when Xsolla learns what Aghanim said to, or about, Xsolla's own people. Further, Defendants' concern about decisions "across Xsolla's departments" ignores that the administrative title "does not give [her] authority over the commercial decisions those departments make." (*Id.* ¶ 5).

**C. <u>Overseeing This Litigation Is a Legal Function, Not a Competitive One</u>**

Defendants contend that because Ms. Bedrosian oversees this litigation for a company controlled by Mr. Agapitov, the Court's reasoning in declining to approve Aghanim's CEO as a designee (Dkt. 173 at 2-3) applies to her. (Dkt. 199 at 3). It does not. Ms. Bedrosian is not Xsolla's CEO or its owner. She is its Chief Legal Officer, and "[o]verseeing litigation is a legal function. It is not competitive business decision-making." (Bedrosian Decl. ¶ 18). The entire premise of a party designee is a person who can direct the litigation with knowledge of the evidence. Defendants' argument would disqualify the very person best suited to that role precisely because she fills it.

The secondhand assertions in the Andry Declaration that Defendants rely on fare no better. Mr. Andry left Xsolla before Ms. Bedrosian joined, has not worked with or even met her, and has no first-hand knowledge of her role. (*Id.* ¶¶ 3, 17).

Finally, Defendants' reliance on *Intel Corp. v. VIA Technologies, Inc.*, 198 F.R.D. 525, 530-31 (N.D. Cal. 2000), for the proposition that "self-executing obligations" may be insufficient (Dkt. 199 at 3) misses the structure of what Ms. Bedrosian has agreed to. Her commitments are not merely promises to refrain from use: AEO material will remain in outside counsel's possession; it will never be sent to her or enter any Xsolla computer or email server; she will review it only at outside counsel's offices or through outside counsel's screen share; and she will make no copies, notes, screenshots, photographs, or recordings. (Bedrosian Decl. ¶¶ 21-24). Those are structural controls that "do not depend on anyone's independence." (*Id.* ¶ 20).

## IV. <u>OUTSIDE COUNSEL ACCESS ALONE IS NOT SUFFICIENT</u>

Defendants argue that outside counsel's access is enough and that any need can be addressed later. (Dkt. 199 at 4-5). The Court has already recognized otherwise: it "suggested party designees to cut through the problem of over designation of

material as AEO[.]" (Dkt. 183 at 6). Outside counsel can read a document, but cannot, without disclosing it, ask the client what it means: whether the Xsolla employees named in it were in fact approached, what the client knows about the investors identified, or whether Aghanim's claimed mitigation is consistent with facts within Xsolla's knowledge. That is the function a designee serves.

Nor is "later" a realistic option. Fact discovery closes on December 4, 2026. (Dkt. 199 at caption). Deferring the question until "a genuine need later arises" (*id.* at 4) would, as a practical matter, deny Xsolla meaningful access for the remainder of fact discovery, including the depositions now being scheduled.

## V. <u>DEFENDANTS HAVE NOT DEMONSTRATED ANY PREJUDICE LIKELY TO RESULT FROM DISCLOSURE TO MS. BEDROSIAN</u>

Across four rounds of filings, Defendants have never identified a concrete harm Aghanim would suffer if Ms. Bedrosian, under the Court's use restrictions, reviewed the material still designated AEO. Indeed, Dkt. 199 identifies no harmful document at all. Its objection to Ms. Bedrosian merely "knowing" the material is an objection to any designee seeing anything, even as Defendants concede outside counsel and experts already have full access under looser controls. (Dkt. 199 at 4). The October 30 stay required only that Xsolla confirm what material remained in dispute and that Ms. Bedrosian is not involved in related competitive decisions (Dkt. 183 at 6). Xsolla has done both (Bedrosian Decl. ¶¶ 8-9), and nothing in Dkt. 199 warrants revisiting the Court's conclusion.

## VI. <u>DEFENDANTS' ALTERNATIVE REQUESTS</u>

For completeness, Xsolla responds to each of Defendants' alternative requests. (Dkt. 199 at 5).

1. <u>A different member of the legal department</u>. For the reasons in Section II.B, substitution would not reduce any cognizable risk and would impair Xsolla's ability to direct the litigation. The Court should decline this request.

2. Bates-number limitation. For the reasons in Section II.C, the three categories are defined by Aghanim's own designations, and the Court did not require a document-by-document list. The Court should decline this request.

3. In-person review only. Ms. Bedrosian has already agreed to review AEO material only at outside counsel's offices or through screen shares controlled by outside counsel, such that no AEO material is ever sent to or stored on an Xsolla device. (Bedrosian Decl. ¶¶ 21(d)-(e), 23). The Court already approved both methods (Dkt. 175 at 2), and Defendants offer no basis to eliminate screen-share review. The Court should decline this request.

## VII. CONCLUSION

Xsolla respectfully requests that the Court lift the stay of its Order approving Ms. Bedrosian as Xsolla's designee (Dkt. 183 at 6) and permit her to review the three categories of AEO material identified in her declaration, subject to the use restrictions and safeguards set forth in paragraphs 21 through 24 of the Bedrosian Declaration.

DATED: November 25, 2026 BLANK ROME LLP

By: */s/ Bridget Briggs*

Dennis Ehling
Michael A. Iannucci *(Pro Hac Vice)*
Bridget Briggs *(Pro Hac Vice)*
Ferlillia V. Roberson *(Pro Hac Vice)*
Benjamin M. Wigley
Alycia S. Tulloch
*Attorneys for Xsolla (USA), Inc. and Aleksandr Agapitov*